JAMES R. MARTIN & others *vs.* CHARLES N. SMITH & others.

Suffolk. March 5, 1934. — April 9, 1934.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, & LUMMUS, JJ.

*Labor Union. Judgment. Res Judicata.*

After an unincorporated international labor union, which included the craft of printers and the craft of mailers, had granted a charter to an unincorporated local union composed of members of the mailers' craft in Boston, the international union amended its constitution so as to permit the formation, within itself, of an unincorporated union comprising the craft of mailers throughout its territory. The union of the mailers' craft was empowered, among other things, to establish subordinate unions of that craft, charters to be procured from the international union and only one such subordinate union to be "chartered in the same place"; to "make all laws for the sole government of its craft"; and to "decide all matters in dispute solely affecting members of its union." It also was provided that such grant of powers should not affect the laws of the international union with respect to certain matters. *Held*, that

(1) The grant of powers to the union of the mailers' craft showed that, with certain exceptions, it was intended to limit the powers of the international union with respect to that craft and to establish the autonomy thereof within the international union;

(2) The power of chartering and of disciplining local unions of the mailers' craft was surrendered by the international union to the union of that craft;

(3) The union of the mailers' craft, rather than the international union, had the final authority to suspend the charter of the local union in Boston.

The union of the mailers' craft above described suspended the charter of the local union in Boston for failure to comply with a certain order. The international union opposed such suspension and took a position favorable to the local union. The laws of the international union and of the union of the mailers' craft provided that a local union could not dissolve itself so long as eight members dissented. Thereafter a majority of the members of the local union voted to strike from the governing law thereof all reference to the union of the mailers' craft, and purported to ignore the suspension of the local union's charter and to function solely as a subordinate body of the international union. A minority of the members of the local union, more than eight in number, retained their membership in the union of the mailers' craft and wished the local union to remain affiliated therewith. In a suit in equity in which the majority and minority members of the local union, the union of the mailers' craft and the international union were parties it was *held,* that

(1) The majority members of the local union had seceded from the union of the mailers' craft and from the local union and had ceased to be members thereof; and the minority members in good standing with the union of the mailers' craft constituted the entire membership of the local union and were entitled to control it;

(2) The majority members of the local union had no standing to represent it or to seek relief in the suit against alleged interference with the local union by the union of the mailers' craft;

(3) The minority members of the local union were entitled to have the majority members enjoined from purporting to act as members thereof unless thereafter admitted as such, and to incidental relief with respect to the property and records thereof;

(4) The local union could have no existence as a subordinate body of the international union without being also a subordinate body of the union of the mailers' craft; and the vote of the majority members of the local union to strike from the governing law thereof all reference to the union of the mailers' craft was void.

Even if a decree of a Federal court in previous proceedings between the parties above mentioned must govern as to all matters distinctly adjudicated by it, it did not control this court in deciding the issues raised in the suit in equity above described, because those issues had not been distinctly adjudicated by such decree, irrespective of the reasoning of the opinion of the Federal court.

BILL IN EQUITY, filed in the Superior Court on March 18, 1929, by certain members of Boston Mailers' Union No. 1 of the International Typographical Union of North America against certain other members of the local union and the officers and members of the Mailers' Trade District Union.

The pleadings are described in the opinion. The suit was referred to a master. After confirmation of his report and supplemental report, the suit came before this court upon a reservation and report by *F. T. Hammond,* J., and, in a decision reported in 280 Mass. 101, was remanded to the Superior Court in order that the officers and members of the International Typographical Union of North America might be made parties, which was done.

Thereafter the suit again was heard by *F. T. Hammond,* J., who made certain supplemental findings, ordered the entry of the final decree described in the opinion and reserved and reported the suit for determination by this court, "such decree to be entered as justice and equity may require." Material facts are stated in the opinion.

*M. J. Robinson,* for the plaintiffs.

*J. F. Barry,* (*J. J. Cronin* with him,) for the defendants.

LUMMUS, J. The International Typographical Union of North America is a voluntary association, in the nature of a labor union, organized many years ago, and consists of about seventy thousand printers and three thousand mailers. In 1892 it granted a charter to a subordinate voluntary association called Newspapers Mailers' Union No. 1 of Boston, in accordance with its practice of instituting subordinate local unions in various cities. The name of this local was later changed to Boston Mailers' Union No. 1. We shall speak of these organizations as the International and the Local, respectively.

In 1902 the constitution of the International was amended so as to permit the formation of a Trade District Union, and there was formed the Mailers' Trade District Union, which we shall call the District. The name is somewhat misleading, for it refers not to a geographical division but to the segregation of the craft of mailers from that of printers in an organization as wide territorially as the International itself. The District was given power (a) to charter, establish and form subordinate unions of its craft, charters to be procured from the International (*McNichols* v. *International Typographical Union,* 63 Fed. Rep. [2d] 490, 491); (b) to issue to members working at its craft,

travelling cards which are important in obtaining employment; (c) to "make all laws for the sole government of its craft"; (d) to "decide all matters in dispute solely affecting members of its union"; (e) to elect officers of the District, the president of which shall be a vice-president of the International; and (f) to collect and forward to the International the per capita tax due to the International from subordinate unions of its craft. All the subordinate local unions of mailers then existing, including the Local of Boston, participated in the formation of the District. The District has functioned ever since, holding annual conventions, establishing new subordinate unions, and exercising all the powers just recited. The members of the Local have been members both of the District and the International, by virtue of their membership. The Local has sent delegates to conventions of both. The District has substantial funds held for the benefit of its members, and funds of the International, in which its members have an interest, are very large.

In 1927, the convention of the District, in which delegates from the Local participated, voted to suspend the charter of the Local unless it should comply with a certain order of the convention within thirty days, which it did not do. The District then suspended the charter of the Local. The International did not support the District in this action. The president of the International gave a written opinion that only the International, and not the District, had power to suspend a subordinate union of mailers. In 1929 the executive council of the International, which conducted its affairs between conventions, voted to sustain the ruling of the president. The International convention of that year ratified the acts of the president and executive council, and voted to preserve the rights of members of the Local to membership in the International. The International regards the Local as one of its subordinate unions in good standing. The majority of the members of the Local, including its officers, have stood by the International, have continued to function as a subordinate union, and have ignored the action of the District in sus-

pending the Local. They have paid no dues to the District, and have acted as though unaffiliated with it. They voted in April, 1929, to strike from the Local constitution, by-laws and general laws all reference to the District. A minority, however, who are included among the defendants, have retained their membership in the District, and wish the Local to remain affiliated with it.

This bill, filed on March 18, 1929, sought to restrain the District from organizing a new subordinate union within the territory covered by the Local, and from interfering with the work of the Local. The defendants, who are the District and the minority of the Local, sought, not only by cross bill but also by counter claim inserted in the answer under Equity Rule 6 of the Superior Court then in force, which adopted Equity Rule 6 of this court (252 Mass. 602), a decree that the majority of the Local have in effect seceded from the District and the Local, and that the minority are entitled to control the Local. The defendants obtained a preliminary injunction upon their cross bill and counter claim, to enable the minority to work at their craft *pendente lite.* The decision of this court in *Martin* v. *Smith*, 280 Mass. 101, resulted in the International being made a party, and being served with notice in Indiana under Rule 14 of the Superior Court (1932). It did not appear, and the cross bill and counter claim were taken against it for confessed.

In *Martin* v. *Smith*, 280 Mass. 101, 105, 106, it was said, "The essential questions, all agree, are, '1. Did the District have the final authority to suspend the charter of the Local? 2. Can the Local exist and function as a subordinate mailers' body of the International without the consent of the District?'" The controversy is, however, part of a larger controversy in which the International is seeking to eliminate the District and restore the direct and exclusive relations between the subordinate unions of mailers and the International which existed prior to 1902. Partisans of the District assert that the International intends also to deprive all mailers of membership in the International, but this is denied. The International con-

vention of 1927 voted to repeal the provision of its constitution for Trade District Unions, and retained that provision in its constitution only by compulsion of the injunction issued in *Howard* v. *Weissmann,* 31 Fed. Rep. (2d) 689.

The judge in the Superior Court ordered the entry of a final decree which in substance dismissed the bill with costs; annulled the vote of the Local by which all reference to the District was stricken from its constitution, by-laws, and general laws; established the right of the District to issue travelling cards and have them recognized by the Local; and enjoined the plaintiffs to recognize such cards. He then reported the case.

An examination of the International constitution convinces us that the powers given to the District, already recited, were intended to limit the powers of the International with respect to mailers, and to establish the autonomy of the mailing craft, with a few exceptions stated. *Howard* v. *Weissmann,* 31 Fed. Rep. (2d) 689. The exceptions were stated in these words: "Such powers, privileges and rights shall not work to repeal or affect the laws of the International Typographical Union regarding revenue, per capita tax, benefits, strikes and lockouts, the six-day law, and allied trades council laws." The constitutions of both the International and the District provide that "Only one English-speaking subordinate union in any distinctive craft shall be chartered in the same place." A violation of that provision would be likely if both the International and the District were to exercise independently the power to charter subordinate local unions of mailers; and that power is expressly granted to the District. We think that the International surrendered to the District the power to charter such local unions and to discipline them. We think that the executive council of the International was right in its ruling made during an earlier controversy in 1908 when it said that "a local body of mailers cannot maintain its connection with the International Typographical Union, unless it is also connected with the Trade District Union. Suspension from one body necessitates suspension by the other. . . . The Mailers'

Trade District Union is the highest authority in all matters relating to the Mailers' Branch of the International Union, and . . . its decisions cannot be reversed by the Executive Council of the International Typographical Union, except where these decisions transgress International law." Under the authority to that end contained in art. XI of its constitution, the District had power to suspend the Local. If the District had the power, no question is made as to the propriety of its exercise. The Local, under the laws of the International and of the District, cannot dissolve itself while eight members dissent, and the dissenting minority adhering to the District number about sixty. When the majority of the Local seceded from the District, they lost the right to act as members of the Local, and their control of the Local is only *de facto,* not *de jure.* The loyal minority is entitled to control the Local. *McFadden* v. *Murphy,* 149 Mass. 341, 345. *Sabourin* v. *Lippe,* 195 Mass. 470, 480. *Balukonis* v. *Lithuanian Roman Catholic Benefit Society,* 272 Mass. 366, 371. *Hamaty* v. *St. George Ladies Society,* 280 Mass. 58, 67.

Nothing inconsistent with these conclusions was adjudged by the Circuit Court of Appeals for the Seventh Circuit in *McNichols* v. *International Typographical Union,* 63 Fed. Rep. (2d) 490, in which the plaintiffs represented the District, the defendants represented the International, and the present plaintiff James R. Martin, the *de facto* president of the Local, intervened with others on the side of the International, under leave to file "their answer and cross-complaint in behalf of themselves and all others similarly situated." All the members of the District and of the International were thus represented in a class suit. It may well be that the decree in that suit must govern as to all matters adjudicated by it. *Hartford Life Ins. Co.* v. *Ibs,* 237 U. S. 662. *Supreme Council of the Royal Arcanum* v. *Green,* 237 U. S. 531. *Supreme Tribe of Ben-Hur* v. *Cauble,* 255 U. S. 356. The *McNichols* case held that the International is not bound to issue a charter to every subordinate union of mailers established by the District, but no such point is involved in this case. It held also that

the District has no power by suspending subordinate unions or members to deprive mailers of their membership in the International and their rights in its funds and benefits. That, too, is not involved in this case. The *McNichols* case did not hold that a subordinate union can exist or function as a subordinate mailers' union of the International without being affiliated with the District. Neither did it hold that the District lacks power to suspend subordinate unions or members from rights in the District, which has the "sole government of its craft." Surely everything not distinctly adjudicated in the *McNichols* case is open for our decision. The final decree in that case, dismissing the bill brought on behalf of the District, adjudicated nothing not made the basis of that decree. *Knowlton* v. *Swampscott*, 280 Mass. 69, 72, 73. *Tait* v. *Western Maryland Railway*, 289 U. S. 620. The reasoning of the opinion in that case cannot bind the parties or the court in the present case.

The decree ordered by the Superior Court did not determine all the questions raised by the pleadings and findings. The plaintiffs have no standing to represent the Local or to obtain an injunction against interference by the District, which is the body entitled to govern the Local. Therefore the bill is to be dismissed with costs. No question of pleading is raised as to the use of a cross bill instead of a counterclaim alone. The defendants are entitled to have established by the final decree (1) that the plaintiffs named and unnamed, the *de facto* officers and majority of the Local, have in fact seceded from the District and the Local and have ceased to be members thereof; (2) that the defendant members of the Local and those adhering to the District and in good standing with the District constitute the entire membership of the Local and are entitled to control it, subject to the laws of the District and the International; and (3) that the purported vote of the Local in April, 1929, by which it voted to strike from its constitution, by-laws and general laws all reference to the District, is null and void. They are entitled also to a perpetual injunction restraining the plaintiffs, named and unnamed, the

*de facto* officers and majority of the Local, from acting or purporting to act in any capacity as officers or members of the Local, unless hereafter elected or admitted officers or members thereof by the authority of the District; and commanding the said plaintiffs on demand to turn over to the then proper officers of the Local all property, assets, books and records of the Local.

*Ordered accordingly.*