## STATE v. KELLY POSTAL.[1]

June 18, 1943.

No. 33,398.

[1]Reported in 10 N. W. (2d) 373.

428

*D. J. Shama, Elwood Fitchette,* and *John Ott,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *Michael J. Dillon,* County Attorney, and *Per M. Larson,* Assistant County Attorney, for the State.

LORING, JUSTICE.

Defendant was indicted, tried, and convicted of grand larceny in the first degree and appeals from an order denying his motion for a new trial.

For some time prior to June 9, 1941, defendant was secretary-treasurer of General Drivers and Helpers Union, Local No. 544, Minneapolis, which existed by virtue of a charter granted by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, hereinafter referred to as I. B. T., which, in turn, was organized under a charter of the American Federation of Labor, hereinafter referred to as A. F. of L. The constitution of I. B. T., as far as material here, provides:

(1) That no one who is a member of the Communist party or who subscribes to its doctrines shall be a member of any local union;

(2) That if the president of I. B. T. has or receives any information leading him to believe that the officers of a local union are dishonest or incompetent or that the union is not being conducted for the benefit of the trade, he may appoint a trustee to take charge of the affairs of the union;

(3) That such trustee shall have power to remove union officers and appoint temporary officers in their stead;

(4) That suspended officers shall turn over all moneys, books, and property of the union to the trustee;

(5) That "it shall be compulsory upon all local unions to keep their money deposited in reliable banks in the name of the local unions, and all moneys paid out for the local union must be paid by check upon the order of the local union and signed by the proper officials"; and

(6) That "No local union can dissolve while there are seven (7) dissenting members."

The record discloses that prior to June 9, 1941, there was considerable friction within Local 544, A. F. of L., between certain members of the union and its officers. The dissatisfied element formed a committee known as the "Committee of 100" (with an estimated membership of 500 to 700), which filed formal charges against certain officers of the local union, including this defendant, on the grounds that they were members of the Communist party or subscribed to its doctrines in violation of the constitution of I. B. T.

The charges also alleged that the executive board, of which this defendant was a member, hired persons, including this defendant, who were grossly negligent in the performance of their duties. After these charges were made, there was a meeting held by several members of the I. B. T. executive board in Chicago, which defendant, Miles Dunne, then president of Local 544, and Ray Rainbolt, recording secretary, attended. This meeting was held in April 1941. On June 3, 1941, another meeting was held in Washington, D. C., presided over by Daniel Tobin, president of I. B. T., at which Vincent Dunne, Ray Rainbolt, and defendant represented the executive board of Local 544. There were also representatives of the Committee of 100 who had preferred the charges. From this record, it does not appear that any definite action was taken at either of these meetings, except that it was generally understood that if the executive board of Local 544 did not petition for a trustee to be appointed to manage the affairs of the union Tobin would proceed to do so, as he had a right to do under the constitution. It also appears that while this defendant and the other members of his committee were in Washington they conferred with one A. D. Lewis, brother of John L. Lewis, in regard to affiliation of Local 544 with the Congress of Industrial Organization, hereinafter referred to as C. I. O.

On Sunday, June 8, 1941, a meeting was held in the Union Hall in Minneapolis which was attended by several hundred persons. It appears that not all of the 5,000 members of Local 544 were notified of this meeting, and in fact only those who possessed a blue admittance card were admitted. It is apparent that only members who were sympathetic with the executive officers obtained these cards. Defendant was not present. At this meeting, several speeches were made, including one by Farrell Dobbs, who, although a member of Local 544, had not made his residence in Minneapolis for some time nor had he been engaged in any craft in that city but who was in fact living in the East and was in the employ of the Socialist Workers' Party.

Next evening, June 9, 1941, the regular membership meeting of

Local 544 was held in a large hall on the third floor of Union Hall which held about 1,000 persons, and on that night it was packed to the doors. The overflow crowd was gathered in several other halls in the same building, including the basement, and still others, who were unable to get into the building, stood on the sidewalk. A loud speaker system was installed in the main hall so that those in the other halls, in the basement, and on the street could hear what transpired in the main hall, but they could not take part in the proceedings. Defendant was present at this meeting. Speeches were given by Miles Dunne and Farrell Dobbs, the general tenor of which expressed dissatisfaction with I. B. T., Daniel Tobin, the Committee of 100, and those who opposed the policies of the executive board. It is apparent that this meeting was somewhat disorderly and that emotions ran high. A resolution was introduced by Miles Dunne that all the funds, property, and records of Local 544 be turned over to a "Union Defense Committee" to be held by it in trust for the general membership. This motion was put to a voice vote and was declared carried. A second resolution was immediately offered to the effect that 544 disaffiliate itself from I. B. T. and affiliate with C. I. O. This motion was also put to a voice vote and was declared carried. Several of the state's witnesses testified that they were present at this meeting and attempted to get the floor to speak against this resolution but were ruled out of order. One Axel Soderberg did speak against the resolution, but it is not clear whether that was before or after its passage. State's witnesses testified that the volume of "noise" made by the voters on these resolutions was about equal as to "Ayes" and "Noes." Defendant's witnesses testified that the resolutions carried with only a few dissenting votes. But there is abundant evidence that more than seven members objected. Even defendant's witnesses admitted a dozen dissenting votes. Obviously, those in the other halls or on the street, while they could hear the speeches and voting, did not vote. A large banner reading "544 C. I. O." was displayed, and the meeting adjourned amid much tumult.

About a month before the above described meeting, defendant,

who as secretary-treasurer had control of the funds of Local 544, instructed his secretary to cease banking the cash receipts, contrary to the constitution of I. B. T., and to retain them in his office. As dues were two dollars per month for each of the approximately 5,000 members, a large sum of money passed through defendant's hands. The $5,000 specified in the indictment is a part of this amount. Defendant claims that he did this at the instruction of the executive board, of which he was a member, and that the directions were given for two reasons: First, to accumulate a cash fund in case of strike trouble (most of the employers' contracts expired on or about June 1, and although nearly 400 strike notices were filed with the state labor conciliator, only one strike materialized); second, to "protect" the funds of the union from any trustee who might be appointed by Tobin.

Defendant took the $5,000 in question from the office of 544 in currency. On May 28, 1941, defendant and Miles Dunne had a conference with one Larry Davidson, who was secretary-treasurer of Local 977, and, according to the testimony of defendant and Dunne, arranged to deliver the money to the bookkeeper for Local 977 as a "loan" to that union. Defendant delivered the money, got a receipt for it, and on June 9 the bookkeeper returned apparently the same currency to defendant unused. The same night defendant turned the money over to Rainbolt, who was chairman of the Union Defense Committee. It is defendant's claim that this was done pursuant to the resolution passed earlier that evening as above described. The money was subsequently used for "organizational" purposes of the new 544, C. I. O.

It is the state's claim that defendant was a member of a conspiracy to steal the $5,000, which was the property of Local 544, A. F. of L., and that the theft was accomplished. Defendant's claim is that the money was taken openly, in good faith, and under a claim of right pursuant to directions of the executive board and the resolution passed at the above described meeting directing him to turn the funds over to the Defense Committee. The appeal is based on three grounds: (1) Insufficiency of the indictment;

(2) admissibility of certain evidence; and (3) erroneous instructions to the jury.

■ Defendant challenged the sufficiency of the indictment, which charges grand larceny in the first degree, in that on June 10, 1941, he appropriated to his own use $5,000 genuine, lawful, and current money of the United States from Minneapolis Drivers and Helpers Union Local 544, an unincorporated association, whose membership, defendant asserts, could readily have been ascertained by the grand jury but whose names were alleged to be unknown to that body. He cites German Land Assn. v. Scholler, 10 Minn. 260 (331), and St. Paul Typothetae v. St. Paul Bookbinders' Union, 94 Minn. 351, 102 N. W. 725, 3 Ann. Cas. 695, to the proposition that such an unincorporated association cannot own property. The Scholler case was one in which it was held that an unincorporated association could not hold real estate in the name of the association, and the Typothetae case held that an unincorporated nonbusiness association had no capacity to sue in the association's name. We do not regard these cases as sustaining defendant's position that Local 544 was incapable of holding its funds in its association name or that it was necessary to allege in the indictment the names of its members as the owners of its funds.

Minn. St. 1941, § 622.01(2), (Mason St. 1927, § 10358), which defines larceny, including the crime usually called embezzlement, specifically recognizes an association as an entity from which it is larceny for one of its officers to appropriate funds either for his own use or for that of any other person. See also *Id.* §§ 628.16, 628.28 (§§ 10645, 10663).

■ Error is assigned on the admission of state's exhibit B, the instrument containing the charges preferred by the Committee of 100 against defendant and other officers of Local 544, alleging that they were members of the Communist party, which rendered them subject to expulsion from membership in 544, and making charges of malfeasance against them. We regard this exhibit and others which followed it as admissible on the question of the defendant's good faith in appropriating the funds which he is charged with

embezzling. It tended to prove that he had knowledge that charges were made against him and the other officers which might result in his removal as an officer, his expulsion from membership in the union, and in the appointment of a trustee for the Local. It tended to explain his purpose in appropriating the union funds. While the state contended that there was a conspiracy amongst the officers of 544, including this defendant, to appropriate these funds, and there is ample evidence to support that contention, it is immaterial to the admission of this evidence whether or not such a conspiracy existed. It is enough that the exhibit throws light on defendant's situation and upon the circumstances under which he appropriated these funds. From all the evidence the jury were justified in believing that defendant for some time before the abortive attempt to secede from the A. F. of L. and to join the C. I. O. contemplated that such action would be desirable from his personal standpoint and would be advantaged by the possession of the funds which he diverted from Local 544.

■ Defendant's principal contention is that he comes within the terms of *Id.* § 622.16 (§ 10372), which reads as follows:

"Upon an indictment for larceny it shall be a sufficient defense that the property was appropriated openly and avowedly, under a claim of title preferred in good faith, even though the claim be untenable."

Is the evidence sufficient to justify the verdict that defendant appropriated the money in bad faith? We think it is. Amongst the multitude of other persuasive circumstances were defendant's instructions to Mrs. Hanifan, his office assistant, on May 12, 1941, to hold out all the cash and not deposit it in the bank for the reason, as he explained to her, that "he was afraid that Tobin would clamp down on 544 and have a receiver appointed." It is very persuasive of an entire lack of good faith on his part.

■ Defendant challenges the admission of evidence in regard to the preliminary meeting held on June 8, to which only the holders of blue tickets were admitted. He was not present. We see noth-

ing prejudicial to him, however, in what occurred there. Apparently the meeting was in the nature of a caucus to make plans with reference to the meeting of the whole membership to be held on June 9.

Nor do we see any prejudicial error in the admission of statements made by the witness Williams, a union member, in the presence of this defendant and other officers of Local 544. They were in the nature of accusations against defendant and others of a violation of the union charter provisions against membership in the union by persons advocating the overthrow of the government by force. To these accusations neither defendant nor any of the other officers made any denial. We think the testimony was admissible as an implied admission that there might be grounds for the appointment of a trustee to take over the affairs of the Local.

■ Complaint is also made of the admission of a cashier's check for $1,000 belonging to the Local which defendant had instructed his secretary to have cashed, the proceeds of which were turned over to him. The proceeds of this check had been the subject of a criminal prosecution in which he had been acquitted by direction of the court. Defendant had introduced the judgment roll of this acquittal, and because of the introduction of the roll the court in the case at bar admitted the testimony of defendant with reference to that check upon that trial. We have carefully read defendant's testimony which was read into this record from the former trial, and we fail to see anything inconsistent with the defense interposed by him in this case. Consequently we see no prejudice.

■ Defendant contends that the trial court did not fairly submit the question of good faith to the jury. The court read to the jury § 622.16 (§ 10372) and instructed it to consider all the testimony with reference to the manner in which and the circumstances under which defendant originally took the money from the safe of Local 544 on May 29, 1941, invited their attention to the various features of the testimony from which they could make their determination, and finally instructed them that if they determined that defendant took the money openly and avowedly under a claim of title preferred in good faith, then their verdict should be "not guilty."

436

The jury returned and asked for instructions:

"\* \* \* if breaking the rules of the International Union and the by-laws, in respect to the moneys in this case, is a breach of contract, or a case of larceny?

"The Court: Well, as I instructed you, the mere breaking of the rules is not a crime, that alone. It is not larceny of itself, unless that be done in connection with the rest of the charge which the court gave you."

The juror who had propounded the question said, "I still am not clear on that. I have two other questions," in response to which the court reread that portion of his charge relating to § 622.16. The particular part which defendant objects to most strenuously is that relative to the effect of the vote at the general membership meeting of June 9. The court left to the jury to determine whether more than seven members dissented from the vote taken to turn the money over to the so-called Defense Committee. It charged that if they were convinced beyond a reasonable doubt that seven or more members dissented from the dissolution of Local 544, A. F. of L., at that meeting,—

"then such vote, even though carried by a majority of the members present, was ineffectual to dissolve Local Union 544, A. F. of L., and that said union remained in existence thereafter, as previously constituted, after the taking of said vote, and had the title to and right of possession of all moneys that had been lawfully turned over to it by its members through payment of dues or otherwise, including the $5,000 here involved, and title to and right to the possession of all the books, papers, office equipment, and contracts in the possession of said Local 544, A. F. of L., on and prior to the said 9th day of June, 1941, and such vote under such circumstances does not constitute a lawful authorization or justification for the taking of the money here involved by this defendant and constitutes no defense whatever to the charge made against him in this indictment; nor does such vote, in the face of any such dissent, authorize or justify the executive board in ordering the defendant to take

and turn over the funds of Local 544, A. F. of L., to Local 544, C. I. O., or to any defense committee or to any person whatsoever; and that such order furnishes no justification of, or defense to, the charge made here against this defendant." And further: "You are further instructed that the members of Local 544, A. F. of L., had an undoubted right to secede and join another union, or form a new union, but, so long as seven or more members of Local 544, A. F. of L., dissented, could not lawfully dissolve 544, A. F. of L., or finance or build up the organization to which they secede, with the money, contracts, and other property of Local 544, A. F. of L., which they had deserted." Then, as suggested by counsel, the court instructed the jury that "the parts of the charge I have read now are only part of the whole instructions that were given."

It will be noted that the court did not go into the question of good faith in the new instructions given but reread to the jury his complete instruction that:

"In determining whether the defendant took the said $5,000 here involved 'openly and avowedly under a claim of title preferred in good faith,' you are instructed that you should consider all that the testimony shows as to the manner in which and the circumstances under which the defendant originally took the said money from the safe of Local 544, A. F. of L., on the 29th of May, 1941," and then invited attention to all such circumstances.

It will be seen from this that the jury was fully instructed, and properly so, on the question of good faith.

We have examined the case of Viereck v. United States, 318 U. S. 236, 63 S. Ct. 561, 87 L. ed. —, cited by defendant, and find no comfort in it for him.

█ The court was right with reference to the inability of the members of Local 544, A. F. of L., to dissolve that Local so long as seven members objected. This was a matter of contract between the Local and the union to which the Local assented when it accepted its charter under the union. Martin v. Smith, 286 Mass. 227, 190 N. E. 113; M & M Wood Working Co. v. N. L. R. B. (9 Cir.)

438

101 F. (2d) 938; Schubert Lodge v. Schubert K. U. Verein, 56 N. J. Eq. 78, 38 A. 347; Brotherhood of Railroad Trainmen v. Williams, 211 Ky. 638, 277 S. W. 500; Harris ex rel. Carpenters Union v. Backman, 160 Or. 520, 86 P. (2d) 456; Local No. 2508 Lumber & Sawmill Workers v. Cairns, 197 Wash. 476, 85 P. (2d) 1109; Local No. 2618 Plywood & Veneer Workers v. Taylor, 197 Wash. 515, 85 P. (2d) 1116. But the court's instruction in this regard did not eliminate from consideration of the jury the question of defendant's good faith, upon which it had fully and clearly previously instructed the jury and upon which it reread its instructions in full when the jury returned for further instructions. The property of labor unions is just as sacred as that of any other organization or person, and the officers of those unions, like officers of other organizations, are bound to respect the title to that property. The defendant apparently forgot this. At least the jury has so found upon a charge which gave him the full benefit of the defense of good faith.

The order appealed from is affirmed, and the sentence pronounced upon defendant is directed to be executed.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.

[1]Reported in 10 N. W. (2d) 353.