WALTERS *v*. PITTSBURGH & LAKE ANGELINE IRON CO.

1. TRUSTS—RESULTING TRUSTS—DISPOSITION OF TRUST FUNDS ON FAILURE OF TRUST.

> Where the employees of a mining company contributed a certain amount of their earnings to the company, to which the latter added a like amount, to be held by it and disbursed from time to time in the payment of injury and death benefits to the employees while the mine continued in operation, *held*, that when the mine ceased operations the trust became extinguished, and, there being no agreement or understanding, express or implied, providing for or contemplating the disposal of any balance in the fund, a resulting trust arose in favor of all who at any time contributed to the fund.

2. SAME.

> To permit those who happened to be retained as employees of the company at the time it ceased operations to divide the money in the fund, *held*, inequitable.

3. SAME.

> That it will be difficult to find all of those entitled to a part of the fund, does not demand application of any other rule.

4. SAME—ACCOUNTING—INTEREST.

> Where there was testimony to the effect that the company never used any of the money in its business, and that it accounted for all of the interest received from the banking institution with which the fund was deposited since 1909, there being no question as to interest prior to that date, *held*, the basis of accounting was correct.

Appeal from Marquette; Flannigan, J. Submitted January 9, 1918. (Docket No. 32.) Decided June 3, 1918.

Bill of interpleader by Thomas Walters against the Pittsburgh & Lake Angeline Iron Company and John Berriman and others to determine the title to a trust

fund. From the decree rendered, certain defendants appeal. Affirmed.

*W. T. Potter,* for plaintiff.

*Thomas Clancey* (*William P. Belden,* of counsel), for defendant company.

*F. A. Bell,* for other appellees.

*M. J. Kennedy,* for appellants.

OSTRANDER, C. J. The court is asked to announce the applicable rule for the distribution of the fund which is now in the hands of the plaintiff, who, because of conflicting claims to the fund, filed a bill of interpleader. Defendants have interpleaded. The interesting and principal question presented in argument by the appellants is answered when the relation of appellants to the fund is determined. If they are surviving members of an association, voluntary or involuntary, which owns the fund which is to be divided, their rights are determined by a principle not controlling if there is no association owner.

In stating the contentions made in the court below, the trial judge said:

"The company claims, as does also a group of individual contributors, that the distribution should be made among all who, at any time, contributed to the fund, in proportion to the amount of their several contributions and that, in such distribution, it should receive one-half the fund. It is claimed by another group of individual contributors the distribution should be among all who contributed, except the company, in proportion to the amounts contributed by each; by another group that they are each entitled to participate in the distribution in proportion to the amounts contributed by them respectively but are silent as to whether or not the company should be allowed to participate; and by another group, in substance, that the club was a voluntary unincorporated association; that by agreement of the members all miners and laborers upon entering the employment of the company auto-

matically became members of the club which member-
ship terminated upon their voluntarily leaving the em-
ployment of the company or being discharged there-
from by the company; that all money paid into the
fund by the company or the workmen became the
property of the club; that the money paid by the com-
pany was on the consideration that all persons injured
and the representatives of persons killed while at work
in the mine, upon recovering benefit from the club
would execute a release of the company from liability
for all damages caused by such injury or death; that
the money in the fund is the absolute property of the
club and held in trust by the company for the club and
that the company has no beneficial interest in the fund
or any part of it; that on September 11, 1912, the
company elected and did go under the so-called work-
men's compensation law, that thereupon the mine club
came to an end and that the total amount in the fund
at present belongs to and should be distributed among
persons who were employees of the mine and there-
fore members of the club when it terminated Septem-
ber 11, 1912."

The appellants belong to the group of contestants
last described.

The facts admitted or proven, omitting many de-
tails, are briefly stated:  The fund in question is made
up of the residue of contributions which were made
by employees of the Pittsburgh & Lake Angeline Iron
Company and by the said company for a certain pur-
pose.  The purpose was to furnish money to pay em-
ployees (the official, engineering and office forces not
included) injured in the service a certain sum and a
certain sum when an injury resulted in death.  The
defendant company undertook to contribute as much
as the aggregate of all contributions of the men, and
for years the mutual understanding was that each
employee should contribute 50 cents monthly, a sum
later on reduced to 25 cents monthly.  In practice,
this sum was deducted from the pay of the employee,
and this whether he worked one day or longer.  The

money was retained by the defendant company and paid out by it, an account thereof being kept by it. Not long after the practice was introduced at defendant's mine, releases were exacted of the injured men —releases of or waivers of claims for damages growing out of the injury of the employee. A similar institution, if it may be called that, a similar practice, obtained in practically all of the iron mining region of the upper peninsula. Men went from mine to mine, working longer or shorter periods, and at whatever mine they were employed it was understood that they should contribute to a similar fund and be thereupon entitled to the agreed upon benefit. There appears to have been some variations in details, but none in the general plan. There was no organization, no society, no association, formed. It was sometimes called a "club" and the fund spoken of as a "club fund," but there were no officers, no salaries, no social or other purposes subserved. Arrangements were made for determining who were entitled to receive benefits, including a committee or committees of employees. This, apparently, for a convenience. No period of the duration of the practice was fixed, no provision or agreement was made for the distribution of any surplus money.

This practice was instituted at the defendant's mine in the year 1885. The defendant ceased to operate the mine September 15, 1915. During the period 5,681 employees made some contribution to the fund. At one time the defendant company employed more than 700 men. In September, 1912, it employed about half of that number, and when operations were concluded but few men were on the pay roll. It turned over to plaintiff, for distribution, the sum of $37,333.58. An accounting has increased the fund so that the total is $54,515.53. It is said in the opinion of the learned trial judge,

"That this figure correctly represents the entire fund is conceded all around and the sole question left for solution is how it shall be distributed."

The decree distributes it to those who at any time contributed to it, in proportion to the contribution. Some 480 of the defendants have appealed.

Broadly stated, it is the contention of appellants in this court that the fund belongs or belonged to an association or club, of which they are the surviving or remaining members, which was dissolved either upon the taking effect of the workmen's compensation law, so-called (2 Comp. Laws 1915, § 5423 *et seq.*), at which time contributions to the fund ceased, or at the time the defendant company ceased operations at the mine. Upon the theory that the proper distribution date was the time when the workmen's compensation law became effective, they further contend that payments made to employees thereafter injured (and there were such payments made) were improperly disbursed and the amount so paid should be accounted for by the defendant corporation.

This court held, *O'Neil* v. *Iron Co.*, 63 Mich. 690, that such a fund is a trust fund and the mining company a trustee. The fund on hand is the aggregate of the over-payments made by each contributor—the aggregate of what was paid more than it was actually necessary to pay to accomplish the mutual purpose of contributing at all. There is no claim made that all persons entitled to benefits did not receive them.

It is true, as appellants contend, that the mere fact that the property was held by a trustee does not determine whether there was an association, a club. Nor, for that matter, do other facts relied upon by them in argument, namely, that the plaintiff who filed the bill of interpleader, the defendant company in its answer, first filed, and the other defendants in their answers describe (or agree to the description) the

body of contributors as a voluntary, unincorporated association, or refer to it as a club, answer conclusively the question whether there was or is an entity entitled to the trust fund. That must be determined from all the facts. There was associated, mutual, action of individuals, but it did not take the form of creating an organization — a society. Consequences sought to be provided for were those attending the work of the individual, and payments contemplated out of the fund were payments to the individual. There was no idea of a fund owned by all or any of those who contributed; there was the idea of a fund created by individual contributions to be held in trust for the purposes indicated and to be used for no other purposes. There was no notion of contributing more than would be sufficient for the purposes indicated, none of accumulating money or of acquiring property. How much would be required was necessarily uncertain, since the number of accidents and deaths in any period could not be certainly anticipated. The business of the defendant company might assume large proportions, or it might reduce the force of employees at pleasure. In this way, new employees would be added to the number entitled to benefits or employees driven to seek work elsewhere. The character of the fund is not changed by the fact that the defendant company might refuse to pay a claimed benefit until a release for damages was furnished. If it was the understanding that such a release should be given, compliance therewith would be necessary before the benefit was due. *Frank* v. *Mining Co.*, 148 Mich. 637.

There is evidence of some rather confused and confusing ideas of officers of the defendant company while the practice of contributing continued, and of counsel after the contributing period ended and the subject of distribution of the fund was presented. No theory now presented affords reason for discontinuing the

making of contributions upon the taking effect of the workmen's compensation act, if further contributions were needed, and there were, it is admitted, disbursements made which although charitable in nature were not warranted when the purpose for which the fund was established is considered.   Questionable disbursements have been repaid to the fund.

In the absence of a formal association of contributors, in an endeavor to fix the status of contributors to the fund with respect thereto, it is said by appellants that the contributions, especially those made by the defendant company, were not gifts, but based upon actual consideration, for which reason a trust in the residue did not result for the benefit of the contributor.   They rely upon the principle stated in 1 Perry on Trusts and Trustees (6th Ed.), § 151:

"If a conveyance has been made upon a valuable consideration, there can be no resulting trust to the grantor, as the payment of a valuable consideration imports an intention to benefit the grantee in case the trusts declared fail, or are imperfectly declared, or do not take effect for any other reason."

See, also, *Everitt* v. *Duss*, 197 Fed. 401, s. c. 206 Fed. 590; *Schwartz* v. *Duss*, 187 U. S. 8; *Baltimore, etc., R. Co.* v. *Relief Ass'n*, 77 Md. 566.

But how can this principle be applied here:   Here was no public charitable use, no gifts for a charitable use for the benefit of the public.   It is and it must be assumed that contributions were payments made for the advantage of the contributor, whether the contributor was an employee or was the employer.   Suppose, for example, that the defendant company had made all of the contributions and upon going out of business claimed all of the residue in the fund.   Could any person, except one whose right to an indemnity or portion of the fund had accrued, contest its right to take the residue?

201—Mich.—25.

The applicable rule was stated by the learned trial judge when he said:

"The fund was deposited with and held by the company upon the express trust to disburse so much thereof as was necessary from time to time, in the payment of injury and death benefits, while the mine continued in operation. When the mine ceased operations the purposes of the trust were discharged and the trust became extinguished. Upon the happening of the event, there being no agreement or understanding, express or implied, providing for or contemplating the disposal of any balance in the fund, a resulting trust arose in favor of all who at any time contributed to the fund."

It is the general rule that if a trust for a specific purpose fails by the failure of the purpose, the property reverts to the donor or his heirs. 1 Perry on Trusts and Trustees (6th Ed.), § 159. And in 39 Cyc. p. 110, the rule is stated as follows:

"Where property is conveyed upon an express trust for particular purposes, but, by reason of its being ineffectually or illegally declared, the trust fails, or is otherwise extinguished or terminated, a resulting trust arises as against the trustee, in favor of the grantor, and those claiming under him, in the property conveyed, or in the residue of the property remaining at the time of the failure or extinguishment of the trust, or after the purposes of the trust have been discharged."

In *Coe* v. *Washington Mills*, 149 Mass. 543, the society formed by employees and employer was more formal, there was more evidence of a voluntary association than here, but it was held, the employing corporation being dissolved, that as to money in the fund, created there as here by joint contributions of employees and the employer, a trust resulted for contributors.

It has been many times decided that persons who withdraw from a voluntary association are not en-

titled to any portion of its property and that those who remain have the right to the property of the association and its use so long as any of the members remain, and, clearly, withdrawing members ought not to decide the right of those not withdrawing to continue the association. *Sommers* v. *Reynolds*, 103 Mich. 307; *Schiller Commandery* v. *Jaennichen*, 116 Mich. 129; *Detroit Light Guard Band* v. *Independent Infantry*, 134 Mich. 598.

In *Hopkins* v. *Crossley*, 132 Mich. 612, 138 Mich. 561, it appeared that an incorporated volunteer fire department preparatory to dissolution attempted to create from its property a trust fund, the income from which should be applied by trustees to certain benevolent uses. The trust was held to be void. 132 Mich. 612. Thereupon the question of distribution of the fund arose, and it was held that it must be divided among the persons recognized as members at the time the corporation was dissolved and the personal representatives of deceased members.

None of these cases disturbs the obviously equitable doctrine of *Coe* v. *Washington Mills, supra,* or the decree appealed from in this case. To permit those who happened to be retained as employees of the defendant company to divide among themselves the money in this fund is manifestly inequitable, the fund having been continued for their benefit until the company ceased to do business.

It must be held that title to the money contributed was in the defendant company as trustee. The period of trusteeship having ended, it was its duty to distribute what remained (the overpayments), to those who contributed it, in proportion to their contributions. It will be difficult to find all of those entitled to a part of the fund, but this fact does not demand application of any other rule.

With respect to the accounting, two contentions are

presented. It is said, *first,* that the trustee should be charged with. all payments made by it from the fund after September 11, 1912, and, *second,* it should be charged interest on the trust fund during the time it was in its possession, not deposited and kept as a separate fund, kept with its own funds. It is not pointed out in the brief that money paid from the fund as benefits after September 11, 1912, was paid to any who had not before that date been a contributor to the fund.

The account of the defendant company credits the fund with interest at bank rates on balances, semiannually, from April, 1909, and it appears that it accounts for all interest it ever received since that date. There was, in the beginning, no surplus, and there was the necessity of meeting at all times lawful demands upon the fund so far as the fund could pay them. But some time in 1908 the fund was deposited in a banking institution in Cleveland. It does not appear that the question of interest prior to 1909 was raised in the court below. There is evidence (testimony) to the effect that the defendant company never did, in fact, use any of the money in its business. Trustees are chargeable with interest on trust funds upon the principle that—

"they have received interest, have used the money themselves, or that they have been negligent either in not paying over the money or in not loaning or investing it so as to render it productive." *Calkins* v. *Bump,* 120 Mich. 335.

We find no reason for disturbing the decree, and it is affirmed, but without costs to either party.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.