## LOW et al. v. HARRIS et al.
### No. 6125.

Circuit Court of Appeals, Seventh Circuit.
June 14, 1937.
Rehearing Denied Aug. 5, 1937.

George W. Dowell, of Du Quain, Ill., C. C. Dreman, of Belleville, Ill., W. W. Damron, of Harrisburg, Ill., and Nobel Y. Dowell, of East Peoria, Ill., for appellants.

Thurlow G. Lewis, of Springfield, Ill., for appellees.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

This appeal is from a decree rendered in an interpleader suit instituted by a national bank receiver to ascertain which of two

claimants is legally entitled to a deposit. The contestants are: Local Union No. 1421 of the United Mine Workers, and Local Union No. 110 of the Progressive Miners, their officials and members. The United Local had long been in existence, but the Progressive Local was newly organized (September 1, 1932). It soon drew to its membership a majority of those who were formerly members of the United Local.

The checking account in question was in the name of "Local Union #1421, U. M. W. A. Buckner, Ill." At the time the bank closed on December 5, 1932, there was $3659.35 on deposit for which a claim was filed by the United Miners Local. A 15% dividend ($548.90) was paid to the United's officer in August, 1932 (before Progressive Local's formation), and three additional dividends, totaling 45% ($1646.69), have since been declared and are the subject of this dispute. Both locals have made demand for these three dividends.

On February 4, 1933, the members of United Local 1421, who were present at a special meeting, voted unanimously to affiliate with the Progressive Miners and authorized the treasurer by resolution to withdraw all funds (which came out of dues collected from wages) and hold same until further order. At the same time they severed relations with the United Union and returned their charter to the subdistrict office of the International Union. Many members have since switched back to the United Local.

A few members of the old United Local decided to continue the old local and to carry on as a local of the United Mine Workers. They requested that the charter which the majority had surrendered, or attempted to surrender, be returned. This was six days after the attempted surrender. The same charter was returned as requested. Upon its return, one meeting of about fifteen men was held. The next meeting was attended by seventy or eighty men. This local now has approximately 460 members, and it represents the miners who work in the mine in the locality.

Which of the two locals is entitled to the bank deposit?

There are several decisions which deal with some of the issues involved in this appeal. They will be discussed later, but because of the controlling importance of particular facts in this case, we will first set forth the various applicable provisions of the United's governing regulations.

The Constitution of the United Mine Workers of America, adopted in 1932, provides (Section 25, Article 14):

"Sec. 25. *No Local Union shall be allowed, for any reason or purpose, to divide its funds among its members* * * *."

Section 26 of the same article provides:

"Sec. 26. If any mine or colliery is permanently abandoned, or should any Local Union for any cause disband, or should its charter be revoked, the charter and all monies, supplies and property, including real estate belonging thereto, shall be taken over by the International Union; provided, that any remaining members of such Local Union in good standing shall be given transfer cards."

Section 2 of Article III provides:

"Charters of Districts, Sub-Districts and Local Unions may be revoked by. the International President, who shall have authority to create a provisional government for the subordinate branch whose charter has been revoked."

It may be conceded that ordinarily upon the dissolution of unincorporated associations, the property of the association is distributed per capita among its members (American Jurisprudence, Associations and Clubs, vol. 4, § 56). In the instant case, however, it is argued first that there was not a dissolution of the local union, but a secession by the majority of the local union, a *unit* in a hierarchy of organizations. The members of such a unit had responsibilities and obligations not alone to their individual association (the local union), but to the superstructure governing it and to fellow organizations. A member of one local could transfer to another local upon changing employment, and have the same rights in the new local that he had in the old. There is thus an inter-organization relation which can not be ignored, but must be acknowledged. Also the provisions of the International Union Constitution, to which the local is subject, are of preemptive significance. Such provisions, above quoted, proscribe a distribution of the local's funds among its members; and if the local disbands, it is specifically provided that the moneys shall be taken over by the International. A majority of one local could not deprive an individual of his right to belong to the International, and such individual could not

be received in another local (thereby profiting in the latter's fund) if reciprocal rights of transfer were not maintained. The individual is a member of the local, but he also has a dual relationship—that is, he is a member of the International as well.

The reported decisions and authorities uphold the appellees' views:

In "Unincorporated Associations and Business Trusts" by Wrightington, it is said (page 351):

"As to the title to personal property of an association, it has been said that it is vested in the individual members, but that one who leaves the association abandons his interest in the property and those who remain succeed to it. How this differs from title in the association is hard to understand. The more satisfactory rule would seem to be that title is in the association. That is the law of associations for profit. In accordance with this view it has been held that title is in the association, that when a group of members secede from the association, even though they are a majority, they lose all interest in its property, that members have no right to sue for a dissolution and a distribution of its assets * * *."

American Jurisprudence, vol. 4, supra, states:

"It has accordingly been decided that funds of a Free Mason Lodge, accumulated under a by-law providing that they should be used 'for the good of the craft, or for the relief of indigent and distressed worthy masons, their widows and orphans,' cannot on the dissolution of the lodge, by a vote of the acting members, be divided among themselves for their private use."

In O'Neill v. Delaney (Sup.) 158 N.Y. S. 665, 666, the court said:

"Looking to the constitution, therefore, as evidencing the contract under which the members parted with their money to create the fund in suit, the conclusion is irresistible that the association—the branch—took title to the fund, and that it was in no sense a collecting agent for the union. * * * The controversy with respect to the moneys which are deposited with the * * * Bank to the credit of 'Branch No. 2' has arisen through a vote of the majority of the members of that branch, present at a meeting, to secede from the parent union, and to form an independent union of their own, known as 'Local 791.' Other members of 'Branch No. 2' assert that they are still the members of the association so styled, and through the plaintiff, as their president, they claim the fund, while the defendant Delaney, representing the reorganized association—the one-time members of 'Branch No. 2'—claims that his associates succeeded to title of the moneys. * * *

"Doubtless all the members of the branch could, by their own act or agreement, apply this fund, which was their own, to any purpose deemed desirable; but a mere majority, at a stated meeting, could not make a transfer of that fund to another organization in the course of a disruption of the existing body. Their presence and voice had no such efficacy. The branch was organized and the fund collected under an express agreement between its members whereby the organization was to have a definite name and purpose inseparably connected with the longshoreman's union—the parent body—to which it was subservient. Within the express purposes of the organization, the members present at a meeting could bind the absentees to the result of a vote taken; but a resolution to end the association itself involved a modification of the very contract under which the meeting, as such, had any significance whatever, and a favorable vote upon that resolution had, of course, no bearing upon the property rights of the members who had not consented to the proposition. * * * Notice was not given to all, and title to the fund could not pass to the new organization which the majority of the individuals present at that meeting decided to create. The result is that, upon the record before me, neither of the parties claimant has established a right to the fund in suit."

To the same general effect, see: Brownfield v. Simon, 94 Misc. 720, 158 N.Y.S. 187; Shipwrights' Joiners' & Calkers' Ass'n, Local No. 2 of Seattle v. Mitchell et al., 60 Wash. 529, 111 P. 780.

Whether there was a dissolution in fact, assuming that members could validly dissolve the local union, is not entirely free from doubt. The court made findings which have some support in the evidence. It found there was no dissolution of Local Union 1421. It found there was a severance of all relationship between the 400 members (of Local Union 1421 who organized a local union that affiliated with the Progressive Miners of America) and the United

Mine Workers of America. It characterized the action of said 400 as a withdrawal to become members of a rival organization. It also found that approximately 278 members continued their allegiance to Local Union 1421, United Mine Workers of America, and that they elected officers and thereafter held meetings under the same charter which the United Mine Workers of America issued to Local Union 1421 thirty-three years earlier; that the members who did not withdraw continued as employees at the mine and those who withdrew and joined the Progressives were never thereafter employed at this mine.

Our conclusions may be briefly summarized as follows:

■ (1) The deposit was made by Local Union No. 1421 of the United Mine Workers and remained the money of such local unless it was voluntarily assigned by such local union or was transferred by operation of law.

■ (2) The local union never validly transferred the money represented by the deposit to another.

■ (3) The majority of Local Union 1421 under the constitution, by-laws, and rules and regulations which governed it, ·could not transfer the money to another, a different union organized by said majority.

(4) A majority of Local Union 1421 could not dissolve said union. Neither could they, under section 25 of the constitution of the United Mine Workers, divide the funds of said local among its members.

■ (5) There was no dissolution of Local Union 1421 where it appears that a majority, to-wit, 400 members at a special meeting, voted to sever all relations with said union and to organize a local union and affiliate with the Progressive Miners of America and where it further appears that 278 members of Local Union 1421 continued their allegiance to the United Mine Workers of America and upon the withdrawal of a majority proceeded to elect officers, hold meetings, and function under the same charter as was originally issued by the International Organization of United Mine Workers and represented all the working miners in all negotiations with the operator.

The decree is

Affirmed.