[Civ. No. 13340. First Dist., Div. One. May 21, 1947.]

H. W. BROWN et al., Respondents, v. HARRY HOOK et al., Appellants.

J. H. Sapiro and George Olshausen for Appellants.

Tobriner & Lazarus, Mathew O. Tobriner and Irving S. Rosenblatt, Jr., for Respondents.

BRAY, J.—Appeal from an order of the superior court granting an injunction pendente lite, enjoining defendants from transferring funds and property of former San Francisco Lodge No. 68, International Association of Machinists, to another union (Machinists' Union No. 68); requiring defendants to refrain from preventing plaintiff International Association of Machinists taking possession of the funds and property, and administering the affairs of San Francisco Lodge No. 68, International Association of Machinists; and restraining defendants from using the name "Machinists' Union No. 68."

This litigation arises out of a conflict between the Grand Lodge of the International Association of Machinists (hereinafter referred to as "International") and defendants Machinists' Union No. 68 and its officers (hereinafter referred to as the "Union"). There is no dispute as to the facts, which are as follows:

International is a voluntary unincorporated organization designed to coordinate the activities of affiliated unions composed of machinists and claiming, among its purposes, the obtaining of higher standards of living for its members. Machinists' Union No. 68, also an unincorporated voluntary association and labor union, was originally organized in 1885. After the organization of International in 1890, the union joined International and was issued a charter as San Francisco Lodge No. 68, I. A. M. (hereinafter referred to as the "Lodge"). It, also, is a voluntary unincorporated association, a labor union.

In the year 1941, disputes between International and the Lodge commenced. In May of that year, the Lodge called a strike in eleven plants where ships were being repaired or constructed, without the consent and over the objection of International. The President of the United States and the President of International intervened, and after six weeks of strike, work was resumed. Thereafter sporadic labor disputes occurred in which the Lodge was involved. In September, 1944, the Lodge became involved in a major labor dispute after it refused to allow its members to work overtime in approximately 105 "uptown" shops. The Navy took over and maintained control of these shops until the middle of September, 1945. On October 7, 1945, without regard to the War Labor Disputes Act and despite the fact that International had previously advised all lodges that they must com-

ply with the provisions of that act, the Lodge voted to strike the "uptown," "fringe" shops and the shipyards.

The Lodge requested the executive council of International, which was then meeting in Washington, to extend strike sanction to it. The executive council notified the Lodge that such strike sanction could not be considered (1) as long as the Lodge failed to comply with the War Labor Disputes Act; (2) until the Lodge severed its relationship with a certain C. I. O. affiliate; and (3) until it refrained from striking shipyards with which agreements of no strikes during the war had been made. The Lodge ignored this communication and on October 29, 1945, went out on strike. The executive council received numerous communications and telegrams from members of the Lodge, civic groups and others in the Bay Area, requesting that International intervene in the strike which it had not authorized.

Thereafter the executive council, except one member, came to San Francisco to make a thorough investigation of the situation. On March 5, 1946, the executive council, through the general secretary-treasurer, notified the Lodge that charges for the suspension or revocation of its charter had been preferred against it, and that a hearing before the executive council would be held at the Whitcomb Hotel on Monday, March 11th, and requested that the Lodge send a committee to this hearing to defend the Lodge against these charges. A copy of the charges accompanied the notice. Immediately the executive board and strike committee of the Lodge called a mass meeting of its members for Sunday, March 10th, for "a full and complete discussion of the situation which has been created by charges against Lodge 68 and the attitude of the Grand Lodge executive council which is in San Francisco. All issues and factors involved will be reported on, and the membership will be accorded an opportunity to take any action they deem appropriate."

At this meeting a majority of the Lodge members were present. The membership then stood between seven and eight thousand persons. The charges made by the executive council were read, and a motion to send a committee to defend against the charges at the meeting called for the next day was voted down. A motion that "Lodge No. 68 withdraw from the International Association of Machinists" was carried by an overwhelming majority. Its charter was returned to International and the members "formed an unincorporated

association known as Machinists Union No. 68 composed of all of the members of former San Francisco Lodge No. 68."

On Monday, March 11th, at the time and place of which notice had been given, no representative of the Lodge having appeared, the executive council found that the Lodge had violated the provisions of the constitution of International, ordered the Lodge temporarily suspended, and the Grand Lodge to take charge of and administer the affairs of the Lodge until such temporary suspension should be lifted. Demand was made on the officers of the Lodge to turn over the books, records, money (about $20,000), property, and office quarters of the Lodge to International. This being refused, this suit was brought, and an application made for an injunction pendente lite, as above set forth, which on hearing was granted.

The question here is whether or not International is entitled to the money, property, etc., of the Lodge (for convenience it will be referred to herein by the single word "property"), and involves primarily the construction of certain clauses in the constitution of "the Grand Lodge, District and Local Lodges." Both parties agree that the local union is a unit in a hierarchy of organizations and that the constitution and by-laws of the union constituted a contract between International and the Lodge, and that both parties are bound by the terms of the contract. (See *Scott* v. *Donahue*, 93 Cal.App. 126 [269 P. 455].)

The constitution has two parts, one, apparently, covering the Grand Lodge, and the other, the local lodges. In the constitution for local lodges appears article B, section 14 (p. 66): "In case of the *suspension, revocation of the charter, expulsion, lapsing, or disbanding* of any local lodge for any cause or reason whatsoever, it shall be the duty of the recording secretary, acting in conjunction with the trustees, to send all funds and property belonging to such local lodge to the General Secretary-Treasurer of the Grand Lodge to be held by him, intact, for a period of at least six (6) months. If within that period application is made therefor by at least fifteen (15) members in good standing in that locality, such local lodge shall, with the approval of the International President and the Executive Council, be reopened and the funds and property returned thereto. And in the event that such local lodge is not reopened, all funds and property shall belong to and become the property of the Grand Lodge." (Emphasis added.)

Appellants contend their action at the meeting of March 10th constituted a withdrawal or secession of their local as a unit, and therefore does not fall within any of the conditions enumerated in section 14, and therefore International is not entitled to any of the Lodge's property. Respondents' position on this question, sustained by the lower court, is that the word "disbanding" in section 14 includes withdrawal and secession. Respondents also contend that the proceedings taken at the March 10th meeting were void because of lack of authority in the officers who called the meeting, and invalidity of the notice given. If section 14 covers a secession by the local lodge, it becomes unnecessary to consider the validity of the secession proceedings for the reason that International would be entitled to the Lodge's property under that section, whether the proceedings to secede were regular or irregular.

This suit is brought by the officers on behalf of the members of International. Neither the Lodge nor its members as such are joined as plaintiffs. (It appears that over nine hundred members of the Lodge are still loyal to International and are paying their dues to it.) Appellants contend that International must stand on the strength of its own title, and as this is a proceeding to declare a forfeiture, the property can only be forfeited if the contract so provides. ". . . when the right for forfeiture is claimed under contract, the condition involving the forfeiture must be strictly interpreted against the party for whose benefit it is created. . . ." (*Scott* v. *Donahue, supra*, 93 Cal.App. 126, 131; Civ. Code, § 1442.)

█ Assuming that the Lodge has seceded from International, the only word in section 14 we are concerned with is the word "disband." Having in mind the rule above stated that the contract must be strictly interpreted against International, does that word include "secession"? In determining the question, it is not sufficient to take abstractly the definitions in the dictionaries, but the word must be construed in its relationship to the other portions of the constitution, and in view of the entire relationship between International and the Lodge as shown in the constitution. The preamble provides (p. II) : "Believing that . . . it is impossible for those who toil to obtain the full reward of their labor other than through *united* action; . . . Now, Therefore; We, The International Association of Machinists, pledge ourselves to labor *unitedly* in behalf of the principles herein set forth, *to per-*

*petuate our Association* on the basis of *solidarity* and justice.
. . .'' (Emphasis added.) The government and superintendence of all local lodges is vested in International ''as the
supreme head of all such lodges.'' (Art. I, § 3, p. 1.) The
International president has the direction and supervision of
all local lodges, with full authority *to suspend individual
members* and may revoke charters. (Art. III, § 5, pp. 12, 13.)
The general secretary-treasurer of International shall audit
the books of any local whenever in his opinion an audit is
advisable and upon his demand any local unit shall turn
over to him all books, vouchers, bills, receipts and records of
such local. Members of local lodges are also members of International. Members are entitled to receive strike or lockout
donations from International. (Art. XI, § 1, p. 28.) Death
benefits to members of local lodges are paid by International.
(Art. XI, § 4, p. 30.) Strikes or other grievances between employer and lodge members must be sanctioned by International, and if carried on without such sanction constitute cause
for suspension of the lodge. (Art. XIII, §§ 2, 3, pp. 36, 37.)
International finances strikes. (Art. XIII, § 5, p. 38.) International can fine or expel a member from both the local lodge
and International for certain offenses. (Art. XXI, § 1, p. 49,
and § 3, p. 50.) Also ''Any member or members of any local
lodge who attempt to inaugurate or encourage secession from
the Grand Lodge or any local lodge, or who advocate, encourage, or attempt to inaugurate any dual labor movement, or who
violate the provisions of the Constitution of the Grand Lodge,
or the constitution for local lodges, shall, upon conviction
thereof, be deemed guilty of conduct unbecoming a member
and subject to fine or expulsion, or both.'' (Art. XXI, § 2,
pp. 49-50.) Amendments to the constitution must be voted
on by the individual members. (Art. XVIII, p. 44.) ''A
local lodge shall consist of not less than fifteen (15) persons in
any locality, qualified for membership and organized as a
local lodge under a charter issued by the Grand Lodge of The
International Association of Machinists.'' (Art. A, § 1, p.
60.) Persons applying to International for a local lodge
charter pledge ''ourselves individually and *collectively* to
be governed by the Constitution, laws, rules and usages of''
International. (Emphasis added; art. B, § 3, p. 62.) By-laws
of local lodges must be submitted to International for ''examination, correction, and approval before being adopted.''
(Art. B, § 8, p. 64.) In case of merger of local lodges the

property and funds of such merged lodges shall be sent to the International and after being there balanced "such balance as remains" shall be returned to the local lodge created by the merger. (Art. B, § 15, p. 66.) Members to qualify as officers of the local must be free of delinquency to International. (Art. C, § 3, p. 67.) Each lodge remits a per capita tax to International and a statement of the dues paid by each member to the local. International issues a "due stamp" which the local lodge gives to each member as a receipt for the dues paid by him. (Art. D, § 4, p. 69, and art. F, § 8, p. 78.) Members in good standing of one local lodge may transfer to any other local lodge. (Art. F, § 13, p. 80.) It is the duty of "any member who has information of the violation of any provisions of the Constitution" of International, as well as of local lodges, to prefer charges against the violator. (Art. K, § 1, p. 87.) No fine in excess of $50 can be assessed against a member unless it is first approved by International. (Art. K, § 7, p. 89.)

A study of these and other parts of the constitution shows a closely integrated relationship between the International and the local lodges, and between International and the individual members, and that while some of the duties and relationships of members and local lodges to and towards International are contained in the "Constitution for Local Lodges," the two constitutions form one integral whole. They evidence the fact that International holds a tight rein over the locals and that they have no being separate and apart from International. Moreover, it is clear that International is given a rather broad control of the property of the local lodges. Witness, that in case of a merger of locals, their property must first be sent to International, and by it returned to the new lodge. The members of the local have responsibilities and obligations, not alone to their individual association (the Lodge), but to the superstructure governing it, and to fellow organizations. A member of one local can transfer to another local upon changing employment, and have the same rights in the new local that he had in the old. There is thus an interorganization relation which cannot be ignored. The individual is a member of the local, but he has a dual relationship, as he is a member of International as well.

Taking the constitution by its four corners, it is apparent that one of the chief purposes of the organization is to accumulate funds for the purpose of maintaining members of

locals on strike, and that an united action and a common interest of members and locals and the International is contemplated. The common purpose and the common obligation is so fully set forth that it could only be a breach of trust, and a violation of the constitution, for any lodge to hand over its funds and to join a rival organization of which no member of the Lodge could become a member without forfeiting his membership in International.

Section 14 is headed ''Grand Lodge Control Over Property.'' It obviously concerns the relationship of the local with the International, not the local with its own members. The first three conditions—''suspension, revocation of the charter, [and] expulsion,'' can only come by action of the International for some dereliction of the local. The next condition, ''lapsing,'' is a situation to be brought about by action or inaction of the local as between it and the parent organization. It is not concerned with lapsing as between the individual members and the local, but a lapsing of the local with the International. So, also, ''disbanding'' treats, not with the disbanding of the local, as between it and its members, but a ''disbanding'' between the local and the International. When this fact, namely, that the section is dealing exclusively with the relationship of the local to the International, is kept in mind, it readily appears that ''disbanding'' must be given a much broader definition than appellants apply to it, namely, a dissolution of the local by the individual members. Construing the word ''disbanding'' thus in regard to the relation between the local and the International as disclosed by the entire constitution, ''secession'' is included. Both parties refer to Webster's New International Dictionary, page 741 (1941) for definition of the word ''disband'': ''To break up the organization of; . . . To disunite the parts of. . . .'' Appellants cite Funk & Wagnalls New Standard Dictionary (1940), page 720: ''1. To discharge from further united service, or to break up the organization of; especially, to discharge from military service. 2. To dismiss or dissociate (an individual) from an organization or connection; discharge. . . .'' Certainly the Lodge here broke up its organization with and disunited as a part of International. Again, it discharged itself from further united service with its parent organization. Both Webster and Funk & Wagnalls give further definitions of ''disband'' but mark them as rare or obsolete. Webster (*supra*) : 'To loose the bonds of; to release; . . . To be released

from a bond, tie, or obligation." Funk & Wagnalls (*supra*) : "To set free, as from a bond. . . . To disintegrate." Roget's International Thesaurus—The Complete Book of Synonyms and Antonyms in American and British Usage—as late as its 1946 edition, under the general heading of "disjunction," 44.11, shows that "disband" has the meaning we have placed on it, for it is there said to be synonymous with "part, part company, separate, disperse, . . . split up, split out [coll.], divide, break it up [slang], leave, take leave, quit, go away; alienate, estrange, break with, split [coll.] ; demobilize, demob [slang]."

While there appears to be no express provision in the constitution to the effect that a local may not withdraw or secede, the whole framework evidences that the locals and their members are so integral a part of the International that they cannot do so and still maintain their property. Article XXI, section 2, page 49, makes it a very serious offense against the organization for any member "to inaugurate or encourage secession from the Grand Lodge or any local lodge, or . . . [to] advocate, encourage or attempt to inaugurate any dual labor movement. . . ." A quite peculiar result would be obtained, were we to hold that the constitution intends that, while advocating secession is a most serious offense for a member, subjecting him to both fine and expulsion from the International, and while, if a local's members peaceably dissolve their own local (the contingency which appellants claim is the only one included in the word "disband") the property of such local shall go to the International, nevertheless, if the members commit that serious offense and secede, the funds and property of the local remain theirs to use in opposing, if they should see fit, the International and its lodges, and even to provide sinews of war to a rival labor group. In view of the complete control by International over the locals, and the relationship between them and it, the only reasonable construction to be given to the word "disbanding" is that it was intended to cover any severance by the lodge of its tie with International, including withdrawal or secession.

Appellants rely principally upon the case of *McCarty* v. *Cavanaugh*, 224 Mass. 521 [113 N.E. 271]. In that case "Pride of the Forest Circle No. 134" unanimously voted to secede from its parent organization, "Companions of the Forest of America," a fraternal beneficiary association. The constitu-

tion governing subordinate lodges of the order provided: "In the event where a circle is about to *disband*" (emphasis added) a certain method of taking the vote of the members should be followed, and if the vote were in favor of disbanding, the moneys in the sick, funeral, and benevolent funds of the Circle would go to the Supreme Circle of the order. The members of the Circle, after voting to secede, refused to turn these moneys over to the Supreme Circle and an action in equity was brought by the latter against the former to recover these funds. The court held that the section above quoted "applies to a case where a circle is about to 'disband' but does not refer to a circle which *secedes* from the association." (Emphasis added.) There was another section of the constitution which provided: "In the event of the *dissolution, seceding or disbanding* of a circle, any beneficial member of the circle who voted in the minority against their circle *disbanding or seceding*" (emphasis added) could pay dues thereafter to the Supreme Circle and be entitled to sickness or death benefits. The court held that this provision did not apply where *all* the members of a circle withdrew leaving no minority to be protected, and then went on to say (p. 273 [113 N.E.]) : "There is no provision of the constitution or by-laws of the Supreme or Grand Circles governing subordinate circles, which forbids the latter from withdrawing or seceding as a whole from the association. Under these circumstances all the members of Circle 134 could rightfully secede or withdraw from the association . . . and without subjecting the property of such subordinate circle to forfeiture, and could continue . . . 'as an association for similar purposes but unaffiliated with any state or national organization.' " While this case flatly holds that "seceding" is not included in the word "disbanding," it was in connection with the particular constitution then before the court. There was no provision against seceding, as in our case where the members are forbidden to even advocate secession. There the constitution itself expressly made a difference between these words, by using the words in one sentence in another part of the document "dissolution, seceding or disbanding." The very fact that these three words are used in the same sentence requires that a different construction be given each of them. Moreover, this case is in exact contrast to a later California case, *Subsidiary H. Ct. A. O. F.* v. *Pestarino*, 41 Cal.App. 712 [183 P. 297].

In this case the Corte Christoforo Colombo No. 8229, A.O.F., by unanimous vote of its members, terminated its existence as a court of the Ancient Order of Foresters, surrendered its charter, and returned its books, regalia and paraphernalia. The funds in its treasury were transferred to a corporation organized by members of the former court and designated ''Corte Christoforo Colombo, No. 1, Universale Ordine dei Foresters.'' This corporation had no connection with the Ancient Order of Foresters, and was not sanctioned by that order. When, after demand, the officers and members of the former court refused to pay over the funds to the sick and funeral fund of the high court, action was brought by the latter to recover these moneys. The constitution provided: ''No court shall voluntarily surrender its charter so long as nine members in good standing object to its surrender, nor shall the funds of said court ever be divided among its members, but on its *dissolution* all funds, books and other property shall be immediately delivered to the Permanent Secretary and applied to the High Court Sick and Funeral Fund.'' (Emphasis added.) The position of the respondents in that case was just the reverse of that of the respondents here. There they contended that they had not ''dissolved''— they had ''disbanded.'' The court held: ''To dissolve means to disorganize, to break up, to separate. When applied to a fraternal order of this nature it means *to surrender the charter, to disband*. The section quoted prohibits the voluntary surrender of a charter so long as nine members in good standing object. Thus, if nine members do not object, a subordinate court may surrender its charter and thereby become dissolved, disbanded, or disorganized. It is the voluntary surrender of the charter that the section quoted refers to, and it is such a voluntary dissolution that is contemplated in the latter part of the section which prohibits the distribution of the funds among the members of the court, and requires the delivery to the high court of all funds, books, and other property.'' (Emphasis added.)

Thus, the actions of the local in seceding from the parent body and setting up a rival organization were determined by the court to be a disbandment and a dissolution. Since the Lodge in the present case adopted the same procedure, it follows that its acts likewise are a disbanding within the provisions of section 14 of the constitution for Local Lodges.

The words "disband" and "secede" have been used by law writers interchangeably. For example, 10 Corpus Juris Secundum, section 63, page 306, action such as taken by the Lodge in the case at bar is referred to as "disbanding." ". . . where the members of a subordinate lodge disband and turn over the funds of the lodge to another society in violation of the laws of the grand lodge, those assisting in the actual disposition of the funds are jointly and severally liable to the grand lodge for the whole fund; and, where the disbanding members of a subordinate lodge form a new order and turn over the funds to it, the new order may be compelled to account for such funds." And "The power of the majority of the members of a subordinate lodge to bind the minority by a vote to secede as a body from the society is likewise governed by the laws of the association and the charter and constitution of the subordinate body, and, in the absence of provision therefor in such laws, a majority may not disband the local as against the dissent of the minority."

In *Rosenthal* v. *Reinfeld,* 48 Misc. 652 [96 N.Y.S. 199], the majority members of a union voted to consolidate with another association. The constitution of the union provided: "This Union shall not be disbanded as long as ten members have voted to continue its existence." The court held that the attempted amalgamation and consolidation with another association constituted a "practical disbandment."

In *Henry* v. *Cox,* 25 Ohio App. 487 [159 N.E. 101], at a meeting of Summit County Klan, No. 27, a majority of its members voted to withdraw as a subordinate branch of the Knights of the Ku Klux Klan and to transfer all of the funds and property of Klan No. 27 to an organization called Protestant Service League. In a suit brought to determine whether the majority or minority group was entitled to these funds and property the court uses the word "disbandment" as characterizing the action of the majority members although it holds that it was not a legal disbandment, because not the unanimous action of the members.

In *Koerner Lodge, No. 6, K. of P.* v. *Grand Lodge K. of P.,* 146 Ind. 639 [45 N.E. 1103], the local lodge seceded as a subordinate lodge of the order, organized a new society and turned the property of the lodge over to it. In a suit by the Grand Lodge to recover this property, the court uses the terms "secession, disbanding and dissolution" interchangeably.

In *Low* v. *Harris,* 90 F.2d 783, the constitution of the United Mine Workers of America used the word "disband." Under circumstances similar to those in our case, the local union of that organization claimed its action to be one of secession rather than a disbanding. The court did not discuss this distinction between words, but assumes that the word "dissolution" covers the action of the local in seceding, forming another organization, and transferring the local's property to it. In this action between the secedents and the loyal minority, the court held that there could be no dissolution of the local unless joined in by all the members.

In *Grand Lodge, International Assn. of Machinists* v. *Reba,* 97 Conn. 235 [116 Atl. 235], the court held that under the charter of International at the time (1922), where the International revoked the charter of a subordinate lodge, the International was not entitled to the local's property, as the only constitutional provision concerning property provided "In case of a lodge lapsing" and that "lapsing" did not include "revocation." Since that time the constitution has been amended to read as hereinbefore set forth.

Appellants argue that because article B, section 14, provides a certain penalty for any member who advocates secession, such is the only penalty permissible for secession, and cite *Dingwall* v. *Amalgamated Assn. etc. Employees,* 4 Cal. App. 565 [88 P. 597]. That was a case in which the constitution of a street railway union provided expulsion for any member who divulged certain information and a fine for all other offenses. The association tried to expel a member for conspiring against its welfare. The court held (p. 569): "The parties to the association having by agreement thus limited and declared the penalty to be imposed for all offenses, it was not within the power of the appellant to impose a different penalty for the offense with which respondent was charged." But our case is not one in which any attempt is being made to impose upon the individual member a different penalty than that imposed by the constitution. It is a question of the rights between the International and the Lodge to be determined by an examination of the constitution as a whole. It by no means follows that the word "secession" in the clause concerning individual members is not included in the word "disband" in the clause concerning the Lodge's relationship to the International. The clause prohibiting members from advocating secession is in the constitution for

International. Article XX, section 3, page 49, provides that International shall provide a constitution for the government and control of local lodges. It is in this constitution for local lodges that the clauses appear which provide for the funds of the local going to International in case of merger (§ 15) and under the conditions mentioned in section 14 hereinbefore quoted. The strong hold that International has over the members is ·emphasized by the placing of the secession inhibition in the International constitution, although, of course, as agreed by both parties, the constitutions together must be considered as the contract between the local, its members, and International.

The situation in *Grand Council Provincial Workmen's Assn.* v. *McPherson*, 8 Dom.L.R. 672 (Canada, 1912), in an action brought by the parent organization against one of its locals, was almost identical with that in the case at bar. There the relationship between the grand council of the Provincial Workmen's Association and the subordinate lodge was similar to the relationship between International and the Lodge, as were the rules binding the subordinate lodge. Instead of the word "disbanding" in the clause relating to the disposition of the lodge property, the word "dissolution" was used. Also there was a statute of the Dominion which provided for the disposition of the lodge's property on "dissolution." The local lodge there attempted to secede and join a rival organization and to transfer its property to trustees to be held for later disposition. The court characterized the action as "secession." The same contention was made there as here, that the action of the local was not a "dissolution." The court, however, held that this action of secession was a dissolution and that a labor organization which owes allegiance to a grand body of which it is a subordinate member cannot, upon secession from the association, dispose of its assets to a rival organization where there is a provision of the grand body that upon the "dissolution" of any subordinate. lodge its property is vested in the grand body. As pointed out in *Subsidiary H. Ct. A.O.F.* v. *Pestarino, supra* (41 Cal.App. 712, 713 [183 P. 297]), "dissolve" "When applied to a fraternal order . . . means *to surrender the charter, to disband.*" (Emphasis added.)

An examination of all of the cases discussing the relationship of the parent organization to the local, either in the case of a fraternal society or a labor union, shows that the deter-

mination by the courts of that relationship depends upon the terms of the particular constitution and the correlation between the two.

We have not deemed it necessary to consider the question which appears in a number of the cases cited on other points as to whether a secession from the parent organization can be effected by only a majority of the members of the local. Article A, section 1, page 60, provides that a local lodge shall consist of not less than fifteen persons. Here the loyal members remaining comprise more than nine hundred. In a case where that question is directly raised in a contest between the parent organization and the local union or lodge, it has been held that there is no secession, unless all members vote to secede. (*Koerner Lodge, No. 6, K. of P.* v. *Grand Lodge K. of P.*, *supra* [45 N.E. (Ohio) 1103]. See, also, *M and M Wood W. Co.* v. *Plywood & Veneer W. L. U. No. 102*, 23 F.Supp. (Ore.) 11.)˙ There are a number of cases holding to the same effect in actions between the minority and majority members of the seceding local. (*Low* v. *Harris, supra* [90 F.2d 783]; *Henry* v. *Cox, supra* [159 N.E. (Ohio) 101]; *Di Silvestro* v.˙ *Sons of Italy Grand Lodge*, 129 Misc. 521 [222 N.Y.S. 203]; *Harris* v. *Backman*, 160 Ore. 520 [86 P.2d 456]; *Local No. 2508, Lumber & Sawmill Workers* v. *Cairns*, 197 Wash. 476 [85 P.2d 1109]; *Lumber and Sawmill Workers Union* v. *International Wood Workers*, 197 Wash. 491 [85 P.2d 1099]; *Local No. 2618, Plywood etc. Workers* v. *Taylor*, 197 Wash. 515 [85 P.2d 1116]; *Brownfield* v. *Simon*, 94 Misc. 720 [158 N.Y.S. 187]; *State* v. *Postal*, 215 Minn. 427 [10 N.W.2d 373].)

Nor have we considered the question of the rights of minority members of San Francisco Lodge No. 68 who remained loyal to it and to International. Neither side here has seen fit to join them as parties to this litigation. There is substantial authority to the effect that International in receiving the property of the Lodge receives it in trust for the minority members.

█ However, in view of the constitutional provision, respondents have a better title to the property than appellants. Whether that title is in trust for the loyal members cannot be raised here. Appellants have not cited a case which holds that where there is a constitutional provision providing for forfeiture to the parent organization, such parent organization cannot recover the forfeited property. *O'Neill* v. *Delaney*, 158˙N.Y.S. 665, cited by appellants on this point, expressly

holds that there was no provision in the constitution under which the property of the locals could become the property of the parent union.

*Walters* v. *Pittsburg & Lake Angeline Iron Co.*, 201 Mich. 379 [167 N.W. 834, 1 A.L.R. 624], is not in point as it deals with a fund held by an iron company as trustee for its employees, which the court ordered to be distributed to the employees in proportion to their contribution to it.

One other question is left for determination. The lower court enjoined defendants from using the name "Machinists' Union No. 68." Appellants contend that this is erroneous, first, because the seceding local is still the same entity as it was before and during its connection with International, and secondly, a number like "68" is not the subject of appropriation. Machinists' Union No. 68 was an entity when it first joined International. While its charter name then became "San Francisco Lodge No. 68, I. A. M." it continued to use the name and be known as "Machinists' Union No. 68" as well as to use and be known under the new name. The letter to its members, after secession, states: "Your Union will continue under the name 'Machinists' Union No. 68' as it has been known for many years." The court below, in its opinion, said: "The names are not substantially different; they are the same. Unquestionably such an appropriation would be calculated to and would have the natural tendency to result in confusion, conflict, disorder and chaos, and would seriously impair the functioning of the International as well as that of the loyal local union. The confusion likely to follow from the use of this name by the seceding local is the reason for denying to it the right to such use rather than the existence of any vested right in the organization (Plaintiffs') objecting to the use of the name." There can be no question but that there would be great confusion in having two unions in San Francisco, one called "Machinists' Union No. 68" and the other "San Francisco Lodge No. 68, I. A. M." even though the latter name is longer and has added to it both "San Francisco" and "I. A. M." Machinists' Union No. 68 lost its identity as an entity separate from the I. A. M. when many years ago it joined that organization. Over the years, its identity has been merged with "San Francisco Lodge No. 68, I. A. M." and even though it now attempts to maintain that entity, it cannot keep a name which for years has identified it with the Lodge and the I. A. M. and which, now

that it no longer wants to be so identified, would lead to great confusion.

It is true that "Machinists' Union No. 68" consists of generic terms, and that generally the courts will not enjoin the use of a name consisting solely of generic terms. (*American Auto. Assn.* v. *American Auto. Owners Assn.*, 216 Cal. 125 [13 P.2d 707].) But where its use would be confusing and misleading the rule is different. In the case last mentioned, upon which appellants strongly rely, the fact that this rule has exceptions is recognized, for the court says (p. 131): "No claim is made as to the right of monopoly by reason of copyright or trademark of the letters AAA, or as to the exclusive right of appellants to appropriate the words 'American Automobile,' for the reason that these words are in common use and are regarded by the law as common property, which may be used by others in combination with other descriptive words, provided they are not used in combination with such other words or symbols or designs *as to render it probable that they would mislead persons possessing ordinary powers of perception.*" (See, also, *Fidelity Appr. Co.* v. *Federal Appr. Co.*, 217 Cal. 307, 317 [18 P.2d 950], also cited by appellants.) It is more than probable that persons possessing ordinary powers of perception would be confused and misled by two machinists' unions in the same area, both numbered 68. In *Hoyt Heater Co.* v. *Hoyt*, 68 Cal.App.2d 523 [157 P.2d 657], a man named Hoyt was enjoined from using his own name in advertising his water heater business because it confused and misled the public into thinking it was the same business as the already established Hoyt Heater Company. There are many cases which support the proposition that an injunction will issue to restrain the use of a name which will mislead the public, particularly where the court finds, as it did here, that "defendants deliberately seek to mislead, confuse and to stultify the public." Among others— *Faisan* v. *Adair*, 144 Ga. 797 [87 S.E. 1080, Ann.Cas. 1918A 243], where the "Ancient Arabic Order of the Nobles of the Mystic Shrine" enjoined the use of the name "Ancient Egyptian Arabic Order of the Nobles of the Mystic Shrine of North and South America"; *International Committee Y. W. C. A.* v. *Young Women's C. A.*, 194 Ill. 194 [62 N.E. 551, 56 L.R.A. 888], where a group seceding from the Y. W. C. A. were restrained from using the name "International Committee of the Young Women's Christian Association"; *Salvation Army*

*in U. S.* v. *American Salvation Army,* 135 App.Div. 268 [120 N.Y.S. 471], where the Salvation Army restrained the use of the name "American Salvation Army"; *Society of War 1812* v. *Society of War 1812 in N. Y.,* 46 App.Div. 568 [62 N.Y.S. 355], where the first named society enjoined the defendant from using its name plus the words "in the State of New York."

In *Purcell* v. *Summers,* 145 F.2d 979, the Methodist Episcopal Church, the Methodist Episcopal Church South and the Methodist Protestant Church united to form Methodist Church. One of the group, claiming to be the only true Methodist Episcopal Church South, seceded and attempted to take the church property and the church with them. The Methodist Church brought suit to restrain the seceding members from using the name Methodist Episcopal Church South. In a similar action the Supreme Court of South Carolina (*Turbeville* v. *Morris,* 203 S.C. 287 [26 S.E.2d 821]) had found that the united church, in adopting the short name "the Methodist Church" had abandoned the name "Methodist Episcopal Church South" and refused to grant an injunction. The federal court in the Purcell case declined to follow the South Carolina court. On the grounds that the names were so similar that their use would cause great confusion the court enjoined the dissident members from using the old name. " 'The close similarity raises an inference of resulting confusion.' " (P. 985.) Here, as in the case at bar, the defendants had originally had the name, gone into the plaintiff organization as a unit, and withdrawn as a unit. "In any case the ground of relief is the element of 'passing off' or implied misrepresentation which enables the one using the name to appropriate to itself the standing and good will which rightfully belong to another; and this is just as truly present when seceding members use the name of an organization which has recently merged with another under a new name as when the use of the old name has been continued." (P. 986.)

"It is said that the words 'Methodist' and 'Episcopal' are generic terms and that defendants have the right to use them for that reason, but defendants are not proposing to use either of these words in a new name so different from the old that no confusion could result. They are using the precise name of the old church; and the question is, not whether they have the right to use 'Methodist' or 'Episcopal' in a new name so

constructed as to avoid confusion, but whether they have the right to use the old name in a way that amounts, as we think it does, to implied misrepresentation to the damage of plaintiffs. The rule applicable is that applied ordinarily in cases of unfair competition and is thus stated in Bims on Unfair Competition, 3d ed., 962:

" 'To establish a cause of action for unfair competition it is not necessary to prove an exclusive right in plaintiff, i. e., that no one else ever has used the mark in the past or that no one else is using it now. The issue is not one of title or exclusive right but of representation, viz., what does the mark as used by plaintiff represent or mean to the public, and what in contrast, does the mark used by the defendant represent.' " (P. 988.)

The case of *State Council, Jr. O. U. A. M.* v. *National Council, Jr. O. U. A. M.*, 71 N.J.Eq. 433 [64 A. 561], cited at length by appellants in their closing brief, while authority for the proposition that appellants' action constituted a secession, with which contention we agree, is not authority for the proposition either that appellants had the right to secede or to retain its former name. In that case state council was an incorporated body of New Jersey which entered into a voluntary affiliation with other state councils, under a national council composed of delegates from the various state councils. When the national council attempted to change the purposes of the organization without the vote required by its constitution the New Jersey state council seceded. The court held that under the framework of the national organization the state council had the right to withdraw and maintain its original entity. The case illustrates the fact that each case depends upon the situation as disclosed by the particular constitution and the particular facts. In this respect it is interesting to note that in *Di Silvestro* v. *Sons of Italy Grand Lodge, supra* (222 N.Y.S. 203), under a somewhat similar situation to that in the last mentioned case, the court held that the subordinate lodge could not secede as such action would impair and destroy the contractual relations between the parent order and its members and the local lodges. To the same effect, *M and M Wood W. Co.* v. *Plywood & Veneer W. L. U. No. 102, supra* (23 F.Supp. (Ore.) 11.)

Appellants cite *Freundschaft Lodge, No. 72, D. O. H.* v. *Alchenburger*, 235 Ill. 438 [85 N.E. 653], on this question, in which the court refused to enjoin the seceding lodges from

using titles containing words similar to those in the title of the parent organization. However, the case was decided simply upon the basis that the parent had no exclusive right to the words in question. There was no discussion of the fact that their similarity might have been misleading or confusing. Respondents are entitled to the injunction here, not because of any exclusive right to its name, but because of the confusion and misleading that must necessarily follow from two similarly named organizations in the same locality, one of which has so long been identified with the other that the general public would have difficulty in determining which was which.

The order appealed from is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied June 20, 1947, and appellants' petition for a hearing by the Supreme Court was denied July 17, 1947.