# Gorman, Appellant. *v.* O'Connor.

*Beneficial Associations—Rights of minority members.*

The majority of the members of a subordinate division of a beneficial association made up of numerous subordinate branches, cannot carry the division and its property over to another association, against the will of the minority.

At a meeting of a branch or division of the Ancient Order of Hibernians, which was attended by little more than a majority of all the members, a majority of those present at the meeting voted to repudiate the constitution of the order, and to affiliate with an association composed of persons who had separated from the old order. *Held* that the vote was ineffectual to carry the whole division with its property to the new association, against the will of the members not consenting.

Argued March 30, 1893. Appeal, No. 9, July T., 1892, by plaintiff, John V. Gorman et al., from decree of C. P. No. 3, Phila. Co., Dec. T., 1885, No. 482, in favor of defendants, William O'Connor et al., dismissing bill in equity. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ.

Bill to restrain transfer of fund in bank.

The case was referred to B. Gordon Bromley, Esq., as master who reported as follows :

" The Ancient Order of Hibernians is an association existing in the United States, whose intent and purpose, as the preamble to its constitution declares, is 'to promote friendship, unity, and true Christian charity among its members by raising and supporting a stock or fund of money for maintaining the aged, sick, blind and infirm members, for the legitimate expenses of the order, and for no other purpose whatever.' While possessing a charter in this state, it is, nevertheless, conducted as a voluntary association, being an integral part of a large body. spread throughout the country, and governed by a general constitution, under which various divisions in each state are formed. The unit, so to speak, from which the intricate system of association and government takes its rise, is the division, of which any number may exist in this country. The five officers of the division, viz., the president, vice president, recording secretary, financial secretary, and treasurer, constitute the division board

of directors, and the same officers of all the divisions in the county, together with the county delegate elected by them, constitute the county board of directors. There is a standing committee of each division, consisting of seven, whose duties are to inquire into the character and qualifications of persons proposed for membership, and try all charges preferred against members. The state delegate, secretary and treasurer are elected from the board of directors of all the divisions in the state. The state board of directors consists of the state and county and division officers throughout the state. A state convention is held biennially. The state delegates, state secretaries, state treasurer, and a county delegate from each county, together with an additional delegate in each county for every one thousand members in good standing over and above the first thousand in said county; also the national directory (consisting of five members) elected by the national convention. This convention is presided over by a national delegate, who, with a national secretary and national treasurer, constitute the officers of the convention, and are elected by the same.

" The national directory, with the national officers, have power to adjust all questions of national importance. They are practically the ruling body of the order in all matters affecting the general interest, subject only to be reversed by the national convention. Their channel of communication with the various divisions is through the national secretary, the state delegate, the state secretary, and finally the county delegate. Each division has power to make its own rules for its internal welfare, provided they are in accordance with the constitution and subject to the approval of the state delegate, state secretary, and county delegate. These details of the machinery and workings of the order are obtained from the constitution of the order, placed in evidence by the defendant, and which was adopted at the national convention held at Cleveland, Ohio, May 16, 1884, before the split occurred, which is the source of the present controversy. In addition to this constitution, a set of by-laws adopted by the state convention were placed in evidence, which did not substantially conflict with the provisions of the constitution as above recited. By the terms of these by-laws a quorum for a division shall consist of five members, in conjunction with the president, vice president and secretary, or their repre-

sentatives.   The order is a beneficial association, its initiation fees, dues, fines and contributions being devoted to sick benefits under the rules of the order.   Apart from the constitution and by-laws, evidence was adduced to prove an unwritten custom or understanding touching the secret features of the order. As to these features, the evidence discloses that the order originated many years ago as an independent organization, an outgrowth of, and bearing close friendly relations with, the order known as the Board of Erin in Great Britain.   Their object being similar, their relationship was fostered by the interchange of cards, and transfer of membership was carried on through the medium of the national delegate, who, at stated intervals, received and transmitted through the regular channels to the several divisions the signs and passwords, termed goods and merchandise, in vogue in the Board of Erin, thus maintaining a constant and close affiliation with what was looked upon as the parent association abroad.   Of this connection no mention is made in the written constitution, and no restraint or rule is imposed upon the national delegate or national directory regarding the maintenance or severance of the relations between them and the foreign board.   No obligation was imposed by any agreement enforcible upon the foreign body to furnish the goods in question, such act being entirely optional and voluntary upon its part.   That the general expectation of the members in joining the order was that the ' goods ' should come from abroad seems free from doubt, but it is no less certain that in all matters affecting the interest of the order the decision of the national directory, in conjunction with the national officers, was final, subject only to be reversed by the national convention called in conformity to the constitution.

" Such being the organization of the order, some time in the month of June, 1884, after the close of the national convention, a call was made by one Murray, a city delegate of New York, having no authority under the constitution to make a call, but being directed by the Board of Erin to do so, for an extra session of the national body to be held in New York in August of that year.   This so-called convention was accordingly held, whereat a new set of national officers was selected and the ' goods ' withheld from the national delegate duly elected at the regular convention held at Cleveland on May 16, 1884.

A circular was then issued by the national directory and officers of the regular or Cleveland convention, announcing the severance of all the relations between the order and the Board of Erin. This circular was ordered to be read at two meetings of each division of the order, and was presented accordingly and read at the regular November meeting of the Division No. 4, of Philadelphia, held at Shear's Hall in that city. Subsequently it was again read at the December meeting of the division, when, in the language of the minutes, ' it was moved and seconded that the circular be received,' and the motion was ' agreed to.' At the next regular meeting of the division, on January 7, 1885, the question having arisen as to the acceptance of the minutes of the prior or December meeting, a vote was taken and the minutes were rejected so far as concerned the acceptance of the circular above mentioned. The evidence shows that the vote was close and there was much confusion, and there is a conflict of testimony as to what the vote was, but from the whole evidence the master finds that the majority favored the rejection of the minutes so far as the circular was concerned, the intention being to disavow the circular and reject the authority of the national directory in severing its allegiance to the Board of Erin. The officers of the division at that time were: William O'Connor, president; Patrick Gorman, vice president; James McGlinn, recording secretary; Edward McElroy, financial secretary; James Roane, treasurer. The standing committee consisted of Charles Coyle, Dennis Donovan, Patrick Burk, John O'Donnell, John Leonard, Michael McArdle, and Thomas Daly. When the sentiment of the majority manifested itself, great confusion resulted—threats being used, and such disorder ensued that the president, William O'Connor, fearing trouble, resigned his office. J. V. Gorman was thereupon elected his successor in office, and the meeting calmed down sufficiently to permit of his being escorted to the chair by a committee appointed by the retiring president. Upon a motion to that effect, a vote of thanks was tendered Mr. O'Connor for his services. Thereupon the adherents of the Cleveland party left the hall, the retiring president having first delivered to the new president the seal of the order and all of the papers and its charter. Upon their departure, a new oath or obligation was administered by the vice president, Patrick

Gorman, a form of the same having been obtained from the secretary of the New York convention, and which differed somewhat from the oath provided by the rules to be administered to members joining the order. The constitution of the order adopted at Cleveland was repudiated by the adoption of the old constitution of the order, which had been in force prior thereto, and from that time forward the Division No. 4, as represented by those who remained in the hall on the night of the split, recognized and affiliated with the order represented by the New York convention, and has ever since sent its delegate to the national convention of said order. There was much conflict of testimony as to the number of those who remained in the hall and of those who left at the time of the split. The general concensus would seem to make the whole number present between sixty and seventy. The minutes of the meeting give thirty-three as the number who remained in the hall, and the testimony of the plaintiffs' witnesses would about average that figure. The defendants' testimony reduces the number who remained to twenty or seventeen. The testimony varied very greatly as to the full membership of the division."

After reviewing this evidence the master continued:

"Subsequently a call was issued, signed by the regular secretary, James McGlinn, and four members of the division, for a special meeting of the division for the purpose of considering and reconsidering the business transacted at the meeting of January 7th. The evidence shows that notice was given of this meeting and received by several members of the New York party, and, as plaintiffs' witness, Fahy, says, on page 109, 'Both sides knew it was to be held.' This meeting was held at Shear's Hall, January 30, 1885. How many attended does not appear. On motion, the action of the division in accepting the resignation of President O'Connor was rescinded, and he withdrew the same. The minutes state that the vacancy in the board of officers caused by the expulsion of Patrick Gorman by the county board was filled by the election of Edward Harley, and the vacancies in the standing committee were filled by the appointment of three members. At the next stated meeting of the body, held in February, seventeen members composing the New York party, were duly charged with violating the constitution, and the case was referred to the standing

committee, who notified them to appear, and on their nonappearance expelled them from the division. This action was subsequently indorsed at the meeting of the Cleveland division, held March 4th. The Division No. 4, as thus constituted, has ever since been recognized by the national convention and state convention in affiliation with the Cleveland party, so called.

" The fund belonging to the division derived from the fines, dues and contributions, and held at the time of the January split in the names of five trustees on deposit at the Western Saving Fund ' for the benefit of sick and deceased members ' of the division, as stated in the minutes of the August meeting, 1884, amounted to the sum of $1,427.50. The plaintiffs herein represent the organization which we have described as the New York party, and the defendants the so-called Cleveland party, and the money thus on deposit forms the subject-matter of this contention.

" The record of this case discloses the fact that on the 6th of February, 1886, a petition was presented to this court by William O'Connor and James McGlinn on behalf of the members of Division No. 4, setting forth that the funds of the said division were deposited in the Western Saving Fund in the names of John V. Gorman, Michael McArdle, Cornelius Hughes, John Flanagan, and Edward Harley, trustees, in accordance with the rules of said institution ; that said trustees had authorized and empowered three of their number, to wit, John V. Gorman, Michael McArdle, and Cornelius Hughes, to represent them in their transactions with the said Saving Fund ; that at a regular stated meeting of the division, held June 3, 1885, Messrs. Michael McArdle, John Flanagan, Edward Harley, Patrick Carr, and Dennis Donovan were duly elected trustees in the place of the former trustees, whereby the said John V. Gorman and Cornelius Hughes ceased to be trustees, their terms of office having expired, and they being no longer members of the organization ; that the said Saving Fund declined to recognize the right of the newly elected trustees to act in the place of the said three selected trustees. The petitioners therefore prayed that the said Michael McArdle, John Flanagan, Edward Harley, Patrick Carr, and Dennis Donovan be appointed trustees in the place of the former trustees. The record further shows that this petition was granted, and the newly appointed trustees were

authorized to withdraw and transfer the said fund, to wit, the sum of $1,427.50, with such interest as may have accrued thereon, belonging to said Division No. 4.

" The bill in this cause prays : (1) That the decree aforesaid be vacated and revoked. (2) That William O'Connor, James McGlinn, and the other defendants named therein, and all other persons holding themselves out as trustees, officers, or members of the alleged Division No. 4 be restrained by injunction from withdrawing, transferring, or in any way meddling with said fund. (3) That the association as represented by the plaintiffs be declared the original and only duly authorized one, and the defendants and all other parties except the plaintiffs be enjoined from calling or styling themselves Division No. 4, Ancient Order of Hibernians. (4) That John V. Gorman and Cornelius Hughes be declared trustees of Division No. 4, with power to withdraw, transfer, set over, or leave on deposit the money in the Western Saving Fund Society to the order of the said John V. Gorman, Michael McArdle, and Cornelius Hughes, trustees of Division No. 4, Ancient Order of Hibernians. (5) Such other relief as shall seem meet.

" The answer of the Western Saving Fund Society of Philadelphia denies knowledge of the facts set forth in the bill, and prays that, if material, they may be proved, and further submits itself to the decree of the court, and prays to be dismissed with its costs and charges.

" Upon the condition of facts here presented the master begs leave to submit as his opinion the following conclusions of law :

" The interference of a chancellor is an extreme measure, and cannot be successfully invoked unless the party applying presents circumstances clearly indicating an injury committed or threatened, and at the same time shows himself to be free from blame. Is such the case here ? The case presented by the bill is that of simple usurpation only.

" A number of men claiming to be the genuine Division No. 4 threatened to assume possession of a fund pertaining to the real Division No. 4, consisting of the complainants themselves. Are they then the real Division No. 4 ? Upon this point the master is of opinion that the complainants have failed to establish their claim. The January meeting was unquestionably a regular meeting of the division, and, notwithstanding the

disorder attending the proceedings, the election of the successor to the retiring president was in all respects regular. The subsequent proceedings, looking to the renunciation of all allegiance to the Cleveland body, were, so far as they affect the rights of the non-assenting members, illegal and void. The circular transmitted to the division through the proper channel had reference to a matter of national interest, because it concerned the ' goods ' which formed a principal feature of the organization—a means of promoting the friendship, unity, and true Christian charity which constituted the object of the order. It was therefore within the power of the national directory and national officers to determine the source whence such goods should be obtained. As no obligation rested upon the Board of Erin to furnish these goods, it is fair to presume that the very integrity of the order was not to depend upon the mere whim of the board. The adoption of a constitution and an oath to support it discountenance any such idea, and in the absence of any express clause giving the Board of Erin power to impose a condition to its gift, involving the absolute abandonment of such constitution, no such power is to be presumed. The position therefore is that of a majority of the number of members present at the meeting, constituting but a fraction of the entire membership, attempting to carry the whole body into secession against the will of the minority. The master is unable to perceive any distinction in principle between this and the cases, whereof many precedents occur in the reports, of members of a congregation forming part of a general conference or synod, professing a certain form of religious belief, attempting, against the will of a minority, to secede from the synod and carry the property of the congregation with them. The leading case in Pennsylvania on the subject is McGinnis v. Watson, 41 Pa. 9, followed by Sutter v. Trustees, etc., 42 Pa. 503; Winebrenner v. Colder, 43 Pa. 244; Schnorr's Appeal, 67 Pa. 138, and others, wherein the right is persistently and emphatically denied. ' People join such associations,' says Judge LOWRIE, in Sutter v. Trustees, etc. (page 511), ' for the sake of their benefits, and from faith that they will be conducted according to known principles, and not by mere whims of majorities. It is therefore of no sort of importance what may be the majority in such matters, it cannot weigh a feather in well known law in

affecting the rights of the minority.  Before civil authority the question is, not which party has the majority but which is right according to the law by which the party has hitherto consented to be governed.'  And in the Appeal of the First Methodist Protestant Church, 16 W. N. 245, the court, in the language of McGinnis v. Watson, says the ' title to church property adheres to that party which is in harmony with its own laws ; and the ecclesiastical laws, usages, customs, and principles which were accepted before the dispute arose are the standards for determining which party is right.'

" The act of the majority at the meeting therefore in severing allegiance to the parent organization cannot be interpreted as the act of the division, but only as the act of separate individuals composing the majority.  Had the entire body seceded, the organization would have become extinct.  What before existed as an organization would then have become a new organization pertaining to another body.  The opposition of those who refused to follow the lead of the seceding body served to keep the organization alive, and the funds remained with them.  In McFadden v. Murphy, 149 Mass. 341, where the facts were almost identical with those shown by the evidence, except that it directly appeared that a large majority of the members sought to transfer the division of an organized body to the new organization, and took possession of the property of an old association as a division of the new society, the court held that the majority ceased to be members of the (old) association, and that the proceedings of the minority who remained members were regular, and that the action of the majority in joining the new division was an evidence of their intention to withdraw from the old, and that by such action they ceased to be members of the society and division under the old constitution. The master holds that the principles laid down in that case fully apply to the case presented here for his determination, and confirm the conclusion at which he has arrived.

" If it be asserted that the proceedings by which the minority sought to continue the organization were in themselves irregular and in violation of the provisions of the constitution, to use the words of the court in Schnorr's Ap., 67 Pa. 138, ' it does not lie in the mouth of the defendants (plaintiffs here) to object in any way in this proceeding to the regularity of the

election of the plaintiffs (defendants here). The defendants are strangers. They made themselves so by their solemn act, throwing off their connection with the church. That they then seceded and withdrew from the church cannot be doubted.' Judge WILLIAMS, in concurring, clearly sets forth the state of the law when he says that 'those who adhere and submit to the regular order of the church, local and general, though a minority, are the true congregation and corporation, if incorporated,' citing Winebrenner v. Colden, supra.

"But it is a fact that the constitution was violated by the minority in their subsequent proceedings. Their first step subsequent to the meeting of January 7th was the issue of a call of a special meeting of the organization, signed by the regular secretary and the four members who claimed allegiance to the old organization (which for convenience the master has termed the Cleveland body). The fact of this meeting being called, and its object, were known to all the members on both sides of the controversy. It was the only thing that the adherents of the Cleveland party could do in order to preserve the entity of the division under the old order of things. The by-laws, it is true, do not specifically provide for a special meeting or for any method by which the body may be convened, but these by-laws were framed by the state convention, and by the terms of the constitution a division can frame its own laws, so far as consistent with the constitution. By the terms of the by-laws also a quorum of the division consists of five members, with the officers or their representatives. Now the officers who sided with the New York party were the new president and financial secretary. They refused or neglected to attend this meeting and there is no intimation that a quorum of the old division did not assemble at the special meeting. Everything was done that could be done to sustain the life of the organization. If any subsequent action of this organization can, under any view, he construed as a departure from its organic law so far as the filling of vacant offices is concerned, the defect was certainly cured at the next annual election; and, inasmuch as no voice was raised against the illegality of any such subsequent action under the constitution, and the division was always recognized in the national and state conventions as the only Division No. 4, no rights seem to be prejudiced by such ac-

tion. The master is, therefore, of the opinion that Division No. 4, as represented in the Cleveland body, is entitled to the fund on deposit, and, being so entitled, had power to change the trustees appointed for the sole purpose of making a deposit of such fund and controlling the same in its behalf in the Western Saving Fund Society, and recommends that the bill be dismissed, and that the trustees duly appointed by the said Division No. 4, Ancient Order of Hibernians, in affiliation with the body herein referred to as the Cleveland body, and being the defendants herein other than the Western Saving Fund Society of Philadelphia, be entitled to the fund on deposit in the said society, with full power and control over the same, and that the plaintiffs pay the costs of this proceeding."

Exceptions overruled, and decree entered dismissing bill.

*Error assigned* was, inter alia, (1) decree, quoting it.

*William W. Wiltbank, Maxwell Stevenson* with him, for appellant.

*James M. Beck* and *Wm. F. Harrity, John G. Johnson* with them, for appellee.

PER CURIAM, April 17, 1893:

An examination of the somewhat voluminous record in this case has satisfied us that the learned master's findings of fact were warranted by the pleadings and proofs; and there appears to be no error in any of his legal conclusions that requires either reversal or modification of the decree. The controlling facts, as well as the conclusions of law, upon which the learned court based its decree, are so clearly and fully presented in the master's report that further reference to them is unnecessary. Neither of the specifications of error is sustained.

Decree affirmed and appeal dismissed, with costs to be paid by appellants.