BRIDGEPORT BRASS WORKERS UNION, LOCAL 320 OF THE INTERNATIONAL UNION OF MINE, MILL AND SMELTER WORKERS, ET AL. v. THOMAS SMITH ET AL.

SUPERIOR COURT          FAIRFIELD COUNTY          FILE No. 75979

Memorandum filed September 21, 1948.

*David R. Lessler,* of Bridgeport, for the Plaintiffs.

*Margaret C. Driscoll,* of Bridgeport, for the Defendants.

CORNELL, J. The plaintiffs are described as Bridgeport Brass Workers Union Local 320 of the International Union of Mine, Mill and Smelter Workers, affiliated with the C. I. O., together with certain named persons who sue "as officers of said

Local" and individually "for and on behalf of themselves and for and on behalf of the other members of said Local 320 and as reprsentatives of said members." The defendants are Brass Workers Union Local 320 of the Industrial Union of Marine and Shipbuilding Workers of America, also affiliated with the C. I. O., together with certain named individuals by and through whom the local acts and whose officers, agents and representatives they are. In hereafter referring to the International Union of Mine, Mill and Smelter Workers, it will be designated as the "international," and the Industrial Union of Marine and Shipbuilding Workers of America will be called the "industrial." Both locals are unincorporated voluntary associations located in Bridgeport. The membership of each is comprised of employees in the production and maintainance departments at the East Main Street and Housatonic Avenue plants of the Bridgeport Brass Company, referred to, hereafter, as the "employer" or "employer corporation". Prior to January 31, 1947, there was but one labor union to which workers, though not all of them, in both of these divisions belonged. This was known as "Local 320" of the International and was the bargaining representative for all of the employees of the Bridgeport Brass Company, with certain exceptions, under the provisions of the National Labor Relations Act. With the employer corporation, it had entered into a contract, with the approval of its parent organization, the International, on February 2, 1944, governing rates of pay and working conditions and containing, among others, a provision whereby the Bridgeport Brass Company bound itself to observe the "check-off," by which it deducted from weekly compensation the union dues of the members of the local and remitted monthly the total to the local. This or an agreement of like intendment at all times since and during the occurrence of the events hereinafter noted has been in effect.

Prior to the fall of 1946, dissatisfaction was engendered among members of the local by the alleged misconduct of one Reid Robinson in connection with his administration of the office of the president of the parent body, the International. In September or October, an election was held in which Robinson sought to be continued in the presidency and was opposed by one James J. Leary and in which all the locals throughout the United States and Canada voted. "The Local" has taken part in the nomination of Leary and supported his candidacy

against Robinson. The vote was canvassed by a committee, a majority of whom reported that Robinson was victorious. Two members, however, submitted a minority report in which it was stated that the total vote in favor of Robinson was arrived at by fraudulent methods and that the application of the provisions of the International's constitution and bylaws according to their intendmen established Robinson's defeat and the election of Leary. All references hereafter to "the minority report" relate to that of the two dissenting members of the canvassing committee mentioned. When this document became available to the officers of Local 320, considerable discussion took place. Finally, at a reguar meeting of Local 320 on the evening of January 26, 1947, following a suggestion made by its president, defendant Thomas Smith, a motion was made, seconded and carried "that a special meeting . . . be called to allow the membership to hear the minority report and take action as they see fit"; also, "that discussion and decisions be made regarding the minority report and action be taken." There is no minute description of it, but the evidence is that when the membership meeting above referred to adjourned at 12:05 a. m. on January 27 the president requested the members of the executive board who were present to remain and that an informal meeting of that body was then had at which a quorum was present. As a result of this the local's financial secretary, another of the defendants, was instructed to arrange for a large hall, for a loud speaker, special police and a permit; likewise to get out notices to the members of the proposed special meeting, which was designated to be held on January 31, 1947. The notice so given was by mail directed to the homes of members, by insertion in daily newspapers and the posting of a notice on bulletin boards stationed in both plants of the employer corporation. Those posted on the bulletin boards and those contained in newspaper advertisements were identical in their description of the matters to come before the meeting and in specifying that these were: "(1) To hear report of minority members of Canvassing Committee on recent elections"; "(2) Consider withdrawal from the International Union of Mine, Mill and Smelter Workers." The mailed notice differed from the others mentioned in its specification of the business to be transacted with reference to the withdrawal of the local from the International in that it stated this to be: "Proposal to withdraw our Local from the International Union of Mine, Mill and Smelter Workers."

Because of the fact that, on January 31, 1947, the date for which the meeting was called, the employer corporation was operating on three shifts, the meeting was divided into two sessions, one of which convened at 10 o'clock in the morning and the other at 7 o'clock in the evening, to provide opportunity for all to attend and vote. Out of the approximately 3700 members of the local working on January 31, 1947, a total of only 147 was recorded as voting at the morning session and 214 in the evening. Of those at the morning session, 108 were announced as in favor of withdrawing from the international and 39 against doing so; at the evening session the president presiding declared that 224 voted to withdraw and 90 against doing so. Thus the total in favor of separating from the international was fixed at 332 and those remaining with it at 129. Particularly at the evening session, there were a considerable number of members who were not counted as voting either way, among whom many had left the hall before the vote was taken during the course of acrimonious debate. It is impossible to determine how many members, participants and nonparticipants in the proceedings were present, but it is certain that the number did not even distantly approach a majority of the eligible-to-vote members of the local.

At the conclusion of the special meeting on January 31, the president, financial secretary and recording secretary subscribed a letter to the International Smelters at its headquarters in Chicago, Illinois, advising that organization that, in accordance with articles 1, 4 and 5 of the latter's constitution, local 320 had withdrawn from connection with it. Without delay the charter granted to the local by the international was returned to it. The officers of the local at the time of the withdrawal continued to be those of the seceders after the withdrawal and remained in possession and control of the funds and effects owned by the local when it separated from the International. At the time of the severance, it was the purpose to affilliate with another parent union within the C. I. O. Pending the culmination of such an attachment, the withdrawing local combined with a large number of others who had also separated from the international in forming a Provisional Metal Worker's Council which they all recognized as a superior body. At a regular meeting of the separated local on May 15, 1947, it was voted to accept the offer of the Industrial Union of Marine and Shipbuilding Workers of America, C. I. O., and

to join as a local under that organizatoin. Subsequently, on May 19, 1947, a charter was delivered to and accepted by the local from that parent body, since which time the group has been known and claims to be "Brassworkers Union 320 of the Industrial Union of Marine and Shipbuilding Workers of America," and its officers remain in possesion and control of the funds and property held by them when they were holding the same as officers of Local 320 affiliated with the international and claim to be holding same for and in behalf and as the property of the local as a subordinate body of the industrial.

A considerable number of the members of the local, led by those who had voted against its withdrawal from the international, contended that the vote for severance was invalid and ineffective to authorize the separation. These claimed that, instead of the local's having cut its ties with the international, the officers of the local and those members thereof who acted with them were merely seceders from the local and as such were without right to retain the local's properties and funds. Claiming to be authorized so to do by certain provisions of the international's constitution, the president of the international, called a special meeting of the local to be held on February 9, 1947, for the purpose of providing for the election of officers of the local in place of those who, as was claimed, had left it. Owing to the issuance of an injunction, the purpose of this meeting was not achieved but, such injunction having been dissolved and the offices having been declared vacant by the international's executive board, a meeting of the local on February 27, 1947, elected temporary officers to fill the alleged vacancies until the terms for which the claimed seceding officers expired. The so-called seceding officers were notified accordingly and also of their claimed expulsion on May 29, 1947, on which latter date, also, at a regular meeting of the local, the purported vote authorizing the withdrawal of the local from the international was claimed to be rescinded. On January 31, 1947, when the vote to withdraw was taken, the local owned bonds to the value of some $20,000 and had the sum of $1800 in cash. Thereafter it was paid by the employer corporation, as its check-off for January and February, 1947, the total sum of $6906. Plaintiffs claim that the securities and moneys mentioned belong to local 320 of the International Union of Mine, Mill and Smelter Workers and that its officers are entitled to possession and control of same.

The foregoing facts, together with others later referred to, are practically undisputed. In view of this circumstance, the cause could have been presented upon a stipulation of facts or, at least, on an agreed statement with reservation to submit evidence limited to some phases of the matter which either of counsel might feel required particular illumination. As it was, many days were occupied with the presentation of evidence and the court has been obliged to read through and sift many hundreds of pages of testimony, by far the greater portion of which is pointless, repetitious and without value in aid of a determination of what finally emerges as questions of law. The dispatch with which a decision may be made in a case such as is the instant one depends to a very large extent on the form in which it is presented and the identification by counsel of the decisive issues. When the court is required to examine all of the testimony, even though the task be a fruitless one, and instead of being placed in a position where it may decide the determinative questions of law is obliged to analyze the issues to first expose them, a longer period of time is required, necessarily, than would otherwise be so.

The burden of the complaint is that the withdrawal of the local from the international was void and legally ineffective to accomplish its severance from the parent organization. The reasons alleged in support of this claim are numerous. They may all be treated, however, as falling within one or the other of the following categories; (a) those which attack the validity and sufficiency of the notice to members of the special meeting at which the vote to withdraw was taken; (b) those which challenge the legality of the proceedings at such meeting, particularly on parliamentary grounds; (c) those which claim that the vote of the withdrawal was impotent to authorize such a separation as is claimed because the motion so to do was not carried by a vote of two-thirds of the members present at the special meeting. As a decision on the last recited ground will be decisive of the whole controversy, it will be examined at the outset. It may be stated as settled law that the charter, constitution and general rules of a parent organization together with the constitution and by-laws of a subordinate unincorporated association constitute a contract, the terms and conditions contained in which regulate rights and privileges as between the parent and subordinate bodies as between the members of the latter as concerns each other and as between

such members and the subordinate association. *Harris ex rel. Carpenters Union* v. *Backman,* 160 Ore., 520, 528; *Brown* v. *Hook,* 79 Cal. App. 2d 781, 794; *Amalgamated Clothing Workers of America* v. *Kiser,* 174 Va. 229, 238, 125 A. L. R., 1251; 7 C. J. S., § 11b; and see *Grand Lodge* v. *Reba,* 97 Conn., 235; *National Circle* v. *Hines,* 88 Conn., 676. The right of a subordinate association to withdraw from its parent organization is, accordingly, dependent upon the provisions of the charter and constitution of the general organization to abide by which assent is given when the subordinate body is received into affiliation with it. The question presented here is not as between the international and those who claim that the local has withdrawn from it, but as between two groups of members of the local, one contending that the local has separated from the international and the other maintaining the contrary. The issue is concerned not so much with the exercise by the local of a right to sever its connection with the international as it is with whether the means by which it attempted to do so were legally efficient to accomplish the purpose.

Such question is frequently resolved by specific provision in the charter or constitution of the parent organization expressly or impliedly accepted by the subordinate, to the effect that so long as a stated number of members of the subordinate association object to its withdrawal from the superior body and remain loyal to it after the remainder of the membership secedes the separation of the subordinate association is not effective. In such case, it is very uniformly held that the remaining required number of loyal members constitute the unit and are entitled to have its funds and other properties as against those who have left. *Local No.* 2508 *Lumber & Sawmill Workers* v. *Cairns,* 197 Wash. 476, 487; *Lumber & Sawmill Workers Union No.* 2623 v. *International Woodworkers of America Local No.* 49, 197 Wash. 491, 499; *Local No.* 2618 *of the Plywood & Veneer Workers of the United Brotherhood of Carpenters & Joiners of America* v. *Taylor,* 197 Wash. 515, 519; *Brownfield* v. *Simon,* 158 N. Y. S. 187, 191; *State* v. *Postal,* 215 Minn. 427, 437; *Harris ex rel. Carpenters Union* v. *Backman,* supra, 528. In the present case, there is no such or any other provision either in the charter bestowed upon the local by, or in the constitution of, the international relating to withdrawal of locals from the parent organization; nor in the local's governing rules. On the contrary, the right of a local to sever its relation to the international is by necessary implication recognized in

the following provision in the charter: ". . . And it is further agreed that should the aforesaid Union *withdraw* or be suspended, it shall pay all indebtedness for supplies, per capita, initiation or reinstatement stamps, also deliver its charter, together with all record books of the Union to the International Union and *all moneys or other resources shall remain the property of the members of the aforesaid Union.*" Constitution, subtitle "Charter", pp. 4-5. (Italics supplied.) Neither in this passage nor in any of the governing law of the local, however, is any mechanism to be invoked by a local to accomplish its withdrawal mentioned. In such a situation, the principles of the general law relating to unincorporated voluntary associations owning property are applicable. Aside from the essential of proper notice of a meeting of the membership, and in the presence of a lack of any provision in constitution or by-laws prescribing the requisite number or percentage of votes of the members of the local, plaintiffs claim that a two-thirds vote of those present at a duly warned meeting, and defendants between the secedents and the loyal minority, the court held that there could be no dissolution of the local unless joined in by all contend a majority of those present and voting, is requisite to authorize a severance of the local from the international. There is no basis whatever in either the constitution of the international or that of the local, or in its by-laws, for either of these claims; nor in the general law.

Insofar as they pretend to predicate upon precepts of parliamentary law, they are equally without foundation. The principle involved is not one of mere procedure or concerned only with the routine business or transactions of a body functioning in pursuit of the objectives for which it was organized, but, on the contrary, has to do with its continued existence in alliance with the parent body to which it has given allegiance or its assumption of a different relationship with another. In this rights of property as well as other considerations are intertwined which cannot be determined by parliamentary, but must be decided in accordance with the principles of substantive, law. Of pertinence here, the current of authority holds that, where there is no provision in the charter or constitution of the parent organization and none in the constitution or by-laws of the subordinate association specifying what vote of the members is necessary to effect a withdrawal or secession of the subordinate association from the parent body, a mere majority of the members (though a quorum be present) voting in favor of such a withdrawal will

not suffice to accomplish that purpose. *National Circle* v. *Hines*, 88 Conn. 676, 680; *Henry* v. *Cox*, 25 Ohio App. 487; *Kayley* v. *McCourt*, 235 Pa. 304, 309; *Gorman* v. *O'Connor*, 155 Pa. 239, 248. The underscored portions of the following statements may be regarded as dicta but are, nevertheless, expressive of those contained in the authorities cited. " 'The power of the majority of the members of a subordinate lodge to bind the minority by a vote to secede as a body from the society is likewise governed by the laws of the association and the charter and constitution of the subordinate body, and, *in the absence of provision therefor in such laws, a majority may not disband the local as against the dissent of the minority'*." (Italics supplied.) *Brown* v. *Hook*, 79 Cal. App. 2d 781, 792. "In any case not thus provided for no action could be taken binding all unless assented to by all". *Hill* v. *Rauhan Aarre*, 200 Mass. 438, 439. In this action the members." *Brown* v. *Hook*, supra, 793, discussing *Low* v. *Harris*, 90 F. 2d 783. There are many other cases the opinions in which contain similar expressions, but the foregoing will suffice to illustrate the principle deemed applicable in the present instance. The case of *Goodman* v. *Jedidjah Lodge*, No. 7, 67 Md., 117, cited by some of the encyclopedic works to the contrary, is not in point here; nor that of *Shipwrights, Joiners & Calkers Assn., Local No. 2 of Seattle*, v. *Mitchell*, 60 Wash. 529. This latter affirms the recognized law that the withdrawal of a subordinate voluntary body from a parent organization does not affect its identity or existence as an unincorporated association. The situation presented here adopts that premise, but the question to the fore, which did not occur in the case referred to, is whether, as the result of the proceedings had, such a separation was legally effectuated. The conclusion under the authorities referred to and upon the reasoning demonstrated is that it was not.

Upon the determination stated, no separation of the local from the international occurred, but instead a secession therefrom on the part of the officers and the members who joined with them in maintaining, in reliance upon the result of the vote taken at the meeting of January 31, 1947, that all connection between the international and the local was severed, and their action, thereafter, in affectedly surrendering the charter of the local to the international and in purporting to affiliate as a local first with the Provisional Metal Worker's Council and thereafter with the industrial, as well as in accepting a charter from the last named organization. See *Grand Lodge of Con-*

*necticut* v. *Grand Lodge of Massachusetts*, 83 Conn. 241, 248, 249. The conclusion stated is decisive of the question whether the proper officers of the local, as the same now are, are entitled to the possession of the moneys, bonds and other funds and personal property in possession or under the control of the seceding officers of the local on January 31, 1947, and such as may have been since paid over to them or delivered into their control for the local. To have effected a transfer or assignment of such properties to the local either as an unaffiliated body or as one subordinate to either the Provisional Metal Worker's Council or the industrial would have required the assent of every member of the local. *Barnes* v. *Church*, 118 Conn., 521, 524. Palpably no such participation on the part of the membership occurred.

In any event, the local could not be divested of either title or possession of its personalty by a mere vote of a majority present at the meeting of January 31, 1947. "Primarily, the right of possession of the property of a voluntary association is in the association, that is, in its members or their officers and agents." *Grand Lodge* v. *Reba*, 97 Conn., 235, 238. In default of a vote of the members of the local legally operative to transfer it, it remains there. This statement is vouched for by a plentitude of authority, among which are the following cases: *Hill* v *Rauhan Aarre*, 200 Mass., 438, 440; *McFadden* v. *Murphy*, 149 Mass., 341, 346; *Local No. 2508 Lumber & Sawmill Workers* v. *Cairns*, 197 Wash., 476, 490; *Lumber & Sawmill Workers Union No. 2623* v. *International Woodworkers of America, Local No. 49*, 197 Wash., 491, 499; *Local No. 2618 of the Plywood & Veneer Workers of the United Brotherhood of Carpenters & Joiners of America* v. *Taylor*, 197 Wash., 515, 522; *Shipwrights, Joiners & Calkers Association Local No. 2* v. *Mitchell*, 60 Wash., 529, 530; *Grand Court of Washington, Foresters of America* v. *Hodel*, 74 Wash., 314, 317, 47 L. R. A. (N. S.) 927; *Kayley* v. *McCourt*, 235 Pa., 304, 309; *Polish Falcons' Gymnastic & Literary Assn.* v. *Kubiak*, 238 Pa., 464, 468; *Gorman* v. *O'Connor*, 155 Pa., 239, 247; *Altmann* v. *Benz*, 27 N. J. Eq., 331; *Height* v. *Democratic Women's Luncheon Club of New Jersey, Inc.*, 131 N. J. Eq., 450, 453; *Great Council, etc.* v. *Mohican Tribe, etc.*, 92 N. J. Eq. 593, 604; *Abels* v. *McKeen*, 18 N. J. Eq., 462, 466; *Low,* v. *Harris*, 90 F. (2d) 783, 786; *Harris, ex rel. Carpenters Union* v. *Backman*, 160 Ore., 520, 526. See note, 131 A. L. R. 902, et seq. The case of *Textile Workers Union, Local*

204 v. *Federal Labor Union,* 240 Ala., 239, 131 A. L. R. 896, 900, instances no deviation from the cases cited supra. The vote in question at the meeting of January 31, 1947, was incompetent to effect either a withdrawal of the local as a unit from the international or to provide any authority for the local's officers as these were at that time to hold or dispose of any of its funds or other property except for and on behalf of the local as an affiliate of the international.

If the foregoing conclusion is sound, the question of the adequacy of the notice given the members of the local of the special meeting of January 31, 1947, is of academic interest, only. Since, however, it is a material aspect of the controversy, a relatively brief statement of the determinations reached concerning it will not be improper. The legal sufficiency of such a notice may be examined from three standpoints, namely, (1) the method of giving it; (2) the legal power of the authority directing it to be done; (3) its content. The by-laws of the local provide for the calling of special meetings of that association but contain no direction concerning the medium to be employed in communicating it nor the minimum number of days which shall elapse between the giving of the notice and the convening of the meeting. The method resorted to with respect to the special meeting in question here was (a) by mailing (third class) a mimeographed copy of a letter to the members; (b) by posting notice on bulletin boards in both plants of the employer corporation; (c) by inserting in the only daily newspaper published and circulating in Bridgeport and its environs paid advertisements; and (4) by the distribution of leaflets throughout the factories. No cognizance is taken of certain news items which appeared in the local dailies, for obvious reasons. Even though the constitution and by-laws are silent as concerns the matter of notice of a special meeting, it is a prerequisite to the validity of any business transacted thereat that notice thereof be given the members. See cases collected in note, 167 A. L. R. 1234, 1235, § 2b. "In the absence of a formal rule, prescribing the requirements of a notice of a special meeting, such notice must be reasonable and must be given in the customary manner." Id., p. 1235, § 3a, and cases cited and examined. Although there appears to have been no previous occasion to convene a special meeting of the local concerning a subject of such importance as that dealt with on January 31, 1947, plaintiffs in their brief concede that "The customary method of calling regular and/or

special meetings for 'ordinary' business was by bulletin notices posted at the plants". In the East Main St. branch, the employer corporation had provided some 35 to 40, and in the Housatonic Avenue, 29 bulletin boards, which were located in such manner that every department was furnished with one. As a practice, notice of the local's meetings were posted upon these. The employer corporation also used them to announce events or developments deemed of interest to its workers. From time to time notices relating to other matters were placed upon them. The local's members knew of all of this and were in the habit of looking at such boards to learn of forthcoming events in connection with their union's activities. It is found as a fact that the posting of notices upon such bulletin boards was a customary means of informing members of meetings of the local. Whether it was a proper method of doing so in connection with a special meeting for such a purpose as that held on January 31, 1947, is a question that it is not necessary to decide in view of the other decisive considerations hereinafter mentioned. The notice by mail addressed to the members, at their respective places of residence, was a proper and sufficient means.

Even though the mediums thus employed were in themselves not subject to criticism, yet the notice afforded by neither of them was adequate. That posted on the factory bulletin boards first appeared, at the earliest, on the morning of January 28, and thus in the view most favorable to the defendants allowed them an interval of time, counting the day when first available and excluding that for which the meeting was called, of but three days. Actually, even that was not afforded to a large percentage of the members. The first lot of the mailed notices consisting of 739 pieces were deposited in the post office at Bridgeport between 3:30 and 6 p. m. on January 28. Even if they had been delivered with the same expedition as first class mail, which they were not, in most instances, the maximum theoretical notice to the addressees would have been (excluding the day of mailing or that of the day of the meeting) but three days. On the 29th two other batches were delivered to the post office, respectively consisting of 1100 and 1353 pieces, and, even if these were received by the members to whom they were addressed (an assumption which the evidence disputes) with the speed of first class mail, but two days' notice would have been afforded. There is reason to believe that a large number of the members received no notice at all and others none until either the day of

the meeting or that next following. Considering the importance of the business transacted at the special meeting and its effect upon the interests of the local as a body and the members individually, it is found that the time when the notice could have come to the attention of the members before the meeting convened was so short as not to afford fair and reasonable notice to them of such meeting.

Both the notices posted on the factory bulletin board and that mailed to the members were subscribed "Thomas A. Smith, President." The local's by-laws provide (Article 5, § 2): "Special meetings of the Local may be called by the President and the Executive Board of the Union or upon petition of ten or more members in writing to the President . . ." Counsel for the defendants as well as counsel for the plaintiff interpret this language to mean that special meetings of the local could be called by only one authority, namely by the president together with the executive board, either upon their own initiative or upon the petition of ten or more members, and since the special meeting of January 31, 1947, was called by the president alone and not in conjunction with the executive board, plaintiffs contend it was called without authority. Neither of the assumptions noted is correct. Article 3, § 2, of the local's by-laws provides: "It shall be the duty of the Executive Board to meet between regular meetings of the Local and take up such extenuating circumstances which may arise and which cannot with justice be deferred until the next regular meeting and to make such recommendations to the Local as they believe will advance the cause of the union. The President shall be chairman of the Executive Board. All decisions of the Board may be appealed to the Local at any regular meeting." It is evident, of course, that all power resides in the membership. If the union were to be dissolved, to withdraw or secede from the international, such a purpose, admittedly, could be achieved only as the result of the valid action of the members.

The executive board, in the provisions of article 3, § 2, is not vested with the power and authority of the membership, which may be exercised by the latter at either a regular or special meeting. Its power is limited to periods between meetings and then only concerning matters which "cannot be deferred until the next regular meeting." Manifestly, if the members of a local met at such a regular meeting and acted upon a particular matter, their having done so excludes the right or power of the ex-

ecutive board's thereafter doing so as respects the same subject. In the present instance, a regular meeting of the local did so act on January 26, 1947, in directing the calling of a special meeting to be held on January 31, 1947, and in specifying the one matter to be considered thereat, namely, "to allow the membership to hear the minority report and take action as they see fit." In the absence, at least, of a written petition thereafter presented by at least ten members to the president, the executive board was without power to change the purpose of the special meeting as the regular meeting had defined it. There is no evidence, either, that the executive board purported to do so. What appears is that the so-called informal meeting of a number of the members of that body sufficient to constitute a quorum held immediately upon the conclusion of the regular meeting of January 26, in consequence of the vote to call the special meeting, passed at such regular meeting, was confined to making arrangements to carry out the objective of the action taken by arranging for a hall of sufficient size, obtaining police protection and the like. By what authority there was added to the agenda of such special meeting the purpose to "Consider Withdrawal from The International Union of Mine, Mill and Smelter Workers," which was the legend of the notices posted on the factory bulletin boards, or the radically different one of "Proposal to withdraw our Local from the International Union of Mine, Mill & Smelter Workers," as contained in the mailed letters, is not clear in the evidence. If it could be found that such addition was directed by the executive board, it was without authority, because, independent of the circumstance that the regular meeting had already acted upon that subject matter, the executive board lacked jurisdiction for another reason. This was that, although there was a sufficiency of members present to make a quorum, nevertheless those members who were absent were not given notice that there was to be a meeting of the executive board at the time and place in question.

While it is true that that body may properly transact business in the presence of a quorum, this presupposes notice to all of the members of that board of the fact of a meeting and the time when and the place where it is to be held. A board or an executive committee must keep a record of all its acts and it can act only when it is in session with a quorum present at a properly called meeting. Unanimous agreement outside of such a meeting is not a legal act of the board. Robert, Parliamentary Law, p.

248; see *Crawford* v. *Bridgeport*, 92 Conn. 431, 436. In the absence of such a notice to all the members of the executive board, there was and could not be a legal meeting of that board and, consequently, none at which there could be a quorum. What happened was that there was merely a gathering of individuals who were members of the executive board which was not a meeting of the executive board, in the presence of lack of notice to all. Under such condition, even if the executive board had the right to prescribe the agenda for the special meeting of the members of the local for January 31, and affected to do so, its action would be a nullity.

In accordance with the foregoing views, the only matter, if any, upon which the local could have taken action was with reference to the minority report. For the reasons discussed, the vote on the subject of the local's withdrawal from the international was void. See cases collected in Annotation, 167 A. L. R. 1233, et seq.

Plaintiffs seek a declaratory judgment with consequential relief. No objection has been made by defendants or any of them to judgment in this form. If any could have been lodged on that score, it would appear that the right to make it has been waived. Consequently, upon the conclusions reached, judgment may enter finding and declaring that the vote had at the special meeting of Bridgeport Brass Workers Union, Local 320 of the International Union of Mine, Mill and Smelter Workers, C. I. O., on January 31, 1947, whereby certain officers and members claimed that said local withdrew from its relation to said international as a labor union subordinate thereto, is void; that said local, notwithstanding said vote, is and at all times since the same has been a local or subordinate body, existing under and by virtue of charter granted to said local fully and in all respects occupying the same status under and in its relationship toward said International Union of Mine, Mill and Smelter Workers as before said vote fully as though said vote had not been taken; and that all moneys, bonds, funds, and other personal property then held, owned or in the possession or under the control of said local or its officers and agents on January 31, 1947, are the property of said local, together with all rights and choses in action then owned by it, or which, were it not for said vote, it would have owned or later acquired, inclusive of all moneys due to it paid or not paid by Bridgeport Brass Company, under any contract with said local pursuant to the National Labor Rela-

tions Act, representing check-off payments, which said properties and moneys are to be held for the benefit of the members thereof by the present officers of said local. As consequential relief, an injunction may issue against Thomas Smith, Alex Cashin, Edward Jones, Arthur Vago, Edward Finnegan, Andrew Pekar, John O'Brien and Alvin Schmidlin, all of the city of Bridgeport, county of Fairfield and state of Connecticut; James L. Holmes of the town of Milford, county of New Haven in said state, and Helen Gaborchak of the town of Stratford, county of Fairfield in said State, and Brass Workers Union Local 320 of the Industrial Union of Marine and Shipbuilding Workers of America, C. I. O., a voluntary association located in the city of Bridgeport, county of Fairfield in said state, that each and all of them refrain from expending, loaning, disbursing, assigning or in any other manner parting with possession of any and all moneys, bonds, funds or other personal property of every kind and description and any interest in the same, whether legal or equitable, in their hands or under their control jointly or severally as officers, representatives or agents of said local and otherwise on January 31, 1947, or any collected or which may have come into their possession or the possession of either of them or under the control of any or all of them in either of said capacities or otherwise while claiming to act for or in behalf of said local or as its substitute or in its stead since that date; likewise with respect to all records, books, papers and documents and other memoranda relating to the business or doings of said local prior to and on January 31, 1947, all under a penalty of $5000 for any single violation of this order by any of said named defendants. It is further adjudged and decreed that each and all of the defendants account to plaintiff Local 320 and its officers for all receipts and expenditures of all moneys, securities and other personal properties since the last audit of their accounts with said local and particularly since January 31, 1947.

There will be no award of money damages, since the basis for such an allowance has not been satisfactorily proved. It will be noted that this decision with purpose avoids any reference to the present status of the named individual defendants as either officers or members of said local. The consequential relief awarded is that only as prayed for which directly flows from the declaratory judgment and is not intended to embrace any collateral matters.