THE AMERICAN BRASS COMPANY v. ANSONIA BRASS WORKERS UNION, LOCAL NO. 445, ET AL.

SUPERIOR COURT     NEW HAVEN COUNTY     FILE NO. 16939
AT WATERBURY

Memorandum filed October 15, 1951.

*Carmody, Larkin & Torrance*, of Waterbury, for the Plaintiff.

*David R. Lessler* and *Margaret Connors Driscoll*, of Bridgeport, and *Thomas R. Robinson* and *Chester T. Corse*, of New Haven, for the Defendants.

CORNELL, J. There is hardly room for doubt as concerns the identity of the decisive issue upon which the judgment on file predicates. However, in view of the fact that the court promised an explanatory memorandum to indicate why that issue was decided as it was and counsel for one of the parties at least appears to wish to be informed in this respect, the following is filed.

The action is one of interpleader. The sum involved (namely $9899) represents "checkoff" payments made pursuant to a written agreement between plaintiff and defendant, Ansonia Brass Workers' Union Local No. 445, affiliated with International Union of Mine, Mill and Smelter Workers, then, but not now, associated with the C. I. O. It is an amalgamated union whose members consist of employees of the American

Brass Company and the Driscoll Wire Company. It is here-after referred to as the international local or the local. The sum mentioned was paid over to the clerk of this court at Water-bury by plaintiff and held by that officer awaiting the outcome of an interlocutory judgment entered on October 23, 1947. There are several parties defendant, consisting of individuals, unions, and officers of the latter, impleaded, in addition to the international local. As a result of the issues developed upon the trial, the claims of only two defendants emerge as those with which concern should be had, namely, the international local and another group designated in the writ as "Ansonia Brass Workers Union, No. 445." This latter, as it appears, is a company of dissidents since associated with the P. M. C. and thereafter and now affiliated with the Industrial Union of Marine and Shipbuilding Workers of America, C. I. O., here-inafter referred to when there is occasion to mention it, as the industrial local. The question of which of the claimants is entitled to the moneys will be regarded, as the parties have treated it upon the hearing and in argument, as existent between the two locals mentioned, namely the international local and the industrial local. It occurs as the result of a division in the international local's membership that took definite form in January, 1947, caused by the agitation of certain officers and members that that local sever its affiliation with the international, its parent organization. This culminated in a duly called and warned special meeting of the members on January 31, 1947, for the purpose of determining the issue. The meeting was adjourned to February 9, 1947, at the Ansonia high school. Upon a secret ballot of the members then present, 604 votes were cast, of which number 294 were registered for the with-drawal of the local from affiliation with the international, and 299 were opposed to so doing. The proposal that the local sever its relations with the international thus failed of adoption.

On or before February 14, 1947, members of the international local in a number in excess of one thousand joined in a written petition addressed to the executive board of that local asking that a "referendum-ballot" be arranged on the question of with-drawal, in accordance with which the local's executive board at a meeting held on February 14, 1947, voted "to have a refer-endum ballot and proceed with a ballot on the question to with-draw from the International Union of Mine, Mill & Smelter Workers." On February 22, 1947, in a signed mimeographed circular letter addressed to members in good standing of the

international local, the latter were informed by Fred W. Rubel-mann as the then president of such local that he had been "ordered" by the executive board of the local "to make arrange-ments for a referendum vote to be held on the question of with-drawal of Ansonia Brass Workers Union from the International Union of Mine, Mill & Smelter Workers" and informed the membership that he had "made arrangements for such referen-dum to be held on Thursday, February 27, 1947." The com-munication named places where and specified the hours between which such "referendum" ballot was to take place. When the "referendum" ballot was taken in accordance with the notice mentioned supra, it resulted as follows: The total number of votes cast were 1234 of which 930 were in favor of "with-drawal"; 299 were opposed to such action and 5 ballots were determined to be void. It is stipulated by the defendants in-ternational local and American Brass Workers' Union, No. 445, that "12. After the said 'referendum vote,' the said local (P. M. C. group) affiliated with P. M. C. and thereafter with the Industrial Union of Marine and Shipbuilding Workers of America, CIO."

From the recited events it seems obvious that the question whether the international local legally withdrew from its parent organization depends upon the efficacy to accomplish that result of the so-called "referendum ballot" held on February 27, 1947.

The signal characteristic of such "referendum ballot" was that it was not taken at a meeting of the members of the local nor under the authority of any motion passed, resolution adopt-ed or vote had at any such meeting, regular or special. Indeed, it is insisted in behalf of the industrial local that the membership of the local when summoned to do so by proper authority may resort to a "referendum" without any direction from a member-ship meeting or by authority thereof. Obviously, if this be so, the residence of such power must be found in its governing law —that is, the constitution of the international, the provisions of the local's charter or those of its own by-laws, since these con-stitute the contractual relations governing the rights and obliga-tions of the members of the local sustained toward each other as well as those existing between the local and its parent body, namely, here, the international. *Bridgeport Brass Workers Union* v. *Smith*, 15 Conn. Sup. 505, 511. No provision of the kind is discoverable in these sources. The term "referendum" is employed therein as descriptive of certain procedures but

none of these bear any analogy to that invoked in the present instance. Thus, the international constitution provides that every amendment thereto, if approved at an annual convention, must be submitted to the members of the international union, "who shall vote upon the same within sixty (60) days"; Art. 27 §-1; the removal of an officer found guilty under the provisions of article 5 of the international constitution shall not subject him to removal unless the findings of the executive board are sustained upon a referendum vote of the entire membership; Art. 5 § 4; the recall of certain officers shall not become effective unless and until approved by the referendum described in article 6 § 1; a strike shall not be called until the same shall be "decided by a referendum vote"; Art. 17 § 1; and "no local shall levy a local assessment except by a majority vote of the membership." Local's By-Laws, Art. 6 § 4. In public affairs a referendum in the conventional sense is the referring of legislative acts to the electorate for their final acceptance or rejection. *Combs v. Gray,* 170 Ark. 956, 962.

The central idea pervading the provisions referred to supra in the local's governing law is analogous since it involves a vote to be taken by the membership of locals (whether at a membership meeting or otherwise) approving or disapproving an act performed or legislation adopted by a body different from that which has the power to accept or reject the same. If, therefore, emphasis be placed on the so-called "referendum" feature of the ballot taken on February 27, 1947, that proceeding did not qualify as such for the reason that its purpose was not to approve or disapprove prior action of some other board, body or officer, but was, in fact an attempt to both originate and finally dispose of the matter voted upon. Empirically, there is no analogy between the vote taken on February 27, 1947, in form or character; as a matter of its governing law there was no authority for such a procedure whatever.

Except in the case of some explicit provision to the contrary in its organic law, a "deliberative body acts only at a meeting, that is, either at a regular meeting or at a special meeting, held pursuant to law." 67 C. J. S. 870, § 4. The by-laws of international local example no departure from this conventional method of transacting its business and administering its affairs. The term "meeting" in this connection implies an assemblage of members in a sufficient number to constitute a quorum who come together pursuant to legal call and due notice to participate in

the business to be transacted in the presence of each other. It signifies opportunity for mutual discussion of the matters before them and debate between them. The so-called referendum called for and had on February 27, 1947, did not purport to be a meeting; it was not a method of voting on the subject previously determined at a membership meeting or upon a subject discussed at such a meeting. Unauthorized as a "referendum," it was, in fact, a vote without a meeting. "[W]here a labor union or other private organization proceeds in violation of its constitution and by-laws such actions are void for want of jurisdiction. . . ." *Minnesota Council* v. *American Federation,* 220 Minn. 179, 193, 160 A. L. R. 533. Since the so-called referendum ballot held on February 27, 1947, was a nullity, it was, of course, impotent to effect a withdrawal of the local from its affiliation with its parent body, the International Union of Mine, Mill and Smelter Workers, or to otherwise affect its existence or identity. The international local claiming the fund is the identical body with which the contract was made with the plaintiff, by the terms of which the plaintiff became obligated to pay the moneys to it. The so-called referendum ballot did not alter the plaintiff's duty in this respect, wherefore the judgment on file determined that the international local was entitled to the fund.

No mention is made here of the membership meeting of February 23, 1947, nor of the fact that an election to determine the bargaining representative of the employees of American Brass Company on May 5, 1947. Neither of these events has any materiality to the issues in the present case.